**McDERMOTT INCORPORATED, a Delaware Corporation, Defendant Below, Appellant,**

v.

**Harry LEWIS and Nina Altman, Plaintiffs Below, Appellees.**

Supreme Court of Delaware.

Submitted: Dec. 9, 1986.
Decided: Sept. 16, 1987.

Charles F. Richards, Jr., Esquire, of Richards, Layton & Finger, Wilmington, Richard F. Nolan (argued), and Dennis E. Glazer, of Davis Polk & Wardwell, New York City, of counsel, for appellant.

Norman M. Monhait, of Morris & Rosenthal, Wilmington, Mordecai Rosenfeld (argued), of Mordecai Rosenfeld, P.C., New York City, and A. Arnold Gershon, of A. Arnold Gershon, P.C., New York City, of counsel, for appellees.

Before CHRISTIE, C.J., HORSEY and MOORE, JJ.

MOORE, Justice:

We confront an important issue of first impression—whether a Delaware subsidiary of a Panamanian corporation may vote the shares it holds in its parent company under circumstances which are prohibited by Delaware law, but not the law of Panama. Necessarily, this involves questions

of foreign law, and applicability of the internal affairs doctrine under Delaware law.

Plaintiffs, Harry Lewis and Nina Altman, filed these consolidated suits in the Court of Chancery in December, 1982 seeking to enjoin or rescind the 1982 Reorganization under which McDermott Incorporated, a Delaware corporation ("McDermott Delaware"), became a 92%-owned subsidiary of McDermott International, Inc., a Panamanian corporation ("International"). Lewis and Altman are stockholders of McDermott Delaware, which emerged from the Reorganization owning approximately 10% of International's common stock. Plaintiffs challenged this aspect of the Reorganization, and the Court of Chancery granted partial summary judgment in their favor, holding that McDermott Delaware could not vote its stock in International.

We conclude that the trial court erred in refusing to apply the law of Panama to the internal affairs of International. There was no nexus between International and the State of Delaware. Moreover, plaintiffs concede that the issues here do not involve the internal affairs of McDermott Delaware. Thus, we decline to follow *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255 (2d Cir.1984), which prohibited a similar device involving a Panamanian subsidiary seeking to vote the shares it held in its Panamanian parent. Accordingly, we reverse. In so doing, we reaffirm the principle that the internal affairs doctrine is a major tenet of Delaware corporation law having important federal constitutional underpinnings.

## I.

International was incorporated in Panama on August 11, 1959, and is principally engaged in providing worldwide marine construction services to the oil and gas industry. Its executive offices are in New Orleans, Louisiana, and there are no operations in Delaware. International does not maintain offices in Delaware, hold meetings or conduct business here, have agents or employees in Delaware, or have any assets here.

McDermott Delaware and its subsidiaries operate throughout the United States in three principal industry segments: marine construction services, power generation systems and equipment, and engineered materials. McDermott Delaware's principal offices are in New Orleans.

Following the 1982 Reorganization, McDermott Delaware became a 92%-owned subsidiary of International. The public stockholders of International hold approximately 90% of the voting power of International, while McDermott Delaware holds about 10%.

The stated "principal purpose" of the reorganization, according to International's prospectus, was to enable the McDermott Group to retain, reinvest and redeploy earnings from operations outside the United States without subjecting such earnings to United States income tax. The prospectus also admitted that the 10% voting interest given to McDermott Delaware would be voted by International, "and such voting power could be used to oppose an attempt by a third party to acquire control of International if the management of International believes such use of the voting power would be in the best interests of the stockholders of International." An exchange offer, and thus the Reorganization, was supported by 89.59% of McDermott Delaware stockholders.[1]

The applicable Panamanian law is set forth in the record by affidavits and opinion letters of Ricardo A. Durling, Esquire, and the deans of two Panamanian law schools, to support the claim that McDermott Delaware's retention of a 10% interest in International, and its right to vote those shares, is permitted by the laws of Panama. Significantly, the plaintiffs have not offered any contrary evidence.

---

1. After expiration of the exchange offer, McDermott announced that a preliminary count of the McDermott Delaware common shares tendered totalled approximately 33,740,000, or approximately 89.59% of the total number of outstanding shares. Of these, 30,000,000 shares were ultimately accepted for exchange pursuant to the terms of the Exchange Offer.

Mr. Durling, an expert on Panamanian corporate law,[2] stated:

7. Article 35 of Panamanian Cabinet Decree No. 247, dated July 16, 1970, which amended the General Corporation Law of Panama, added provisions which are applicable only to certain corporations incorporated under the laws of Panama. Article 35 states:

"Shares of a corporation owned by [an]other corporation in which the former corporation owns the majority of shares shall not be entitled to vote at Meetings of Shareholders nor shall be deemed as issued and outstanding shares for purposes of quorum."

8. Article 37 of Panamanian Cabinet Decree No. 247 specifically limits the prohibition on voting contained in Article 35 to those corporations registered with the National Securities Commission of Panama or those corporations whose shares are sold to the public within Panama. Article 37 states:

"The provisions contained in the foregoing Articles 34, 35 and 36 shall be applicable to corporations registered in the National Securities Commission and those whose shares are sold on the market, even though such corporations do not offer their own shares to the public."

Article 37 of Cabinet Decree No. 247 of 1970, as amended by cabinet Decree No. 30 of 1972.

9. I have examined a Certificate issued by the National Securities Commission (of Panama) to the effect that International is not registered with that Commission, and have therefore ascertained that International is not registered with that Commission. Accordingly, the prohibition set forth in Article 35 of Cabinet Decree No. 247 does not apply to International unless its stock is sold on the market in Panama. No Panamanian corporation, except one whose shares are either (a) registered with the National Securities Commission or (b) sold on the Panama market, is subject to the limita-

tions of Article 35 of Cabinet Decree No. 247.

10. There is no general public policy of the Republic of Panama in favor of precluding Panamanian corporations from selling or issuing stock to their subsidiaries or precluding a subsidiary from voting any stock held of its Panamanian corporate parent, except for those corporations falling within the scope of Article 37. *It is generally accepted by Panamanian counsel that, with the exceptions described above, subsidiaries may vote the stock held in their parent corporations.*

11. A recent opinion of the General Attorney of Panama, dated May 2, 1984, has interpreted the proviso of Article 37 relating to shares "sold in the market," to mean that if a corporation's shares are sold in a private manner in Panama to a number of persons not exceeding 10 per year, such shares will not be considered to have been "sold in the market." ... To the best of my knowledge, none of International's securities has been sold to primary or secondary purchasers in Panama.

12. Based upon the foregoing, I am of the opinion that:

(a) McDermott Delaware can lawfully vote its shares in International at any of International's shareholders meetings;

(b) the provisions contained in Section 17 of Panama's General Corporation law are not applicable to shares held by McDermott Delaware, one of International's subsidiaries; and

(c) the retention by McDermott Delaware of a 10% interest in the voting power of International pursuant to the reorganization is lawful under applicable Panama law.

Appendix to Appellant's Opening Brief at A–178 to A–181. (Emphasis added).

Bonifacio Diez Fernandez, Dean of the Law School of the Catholic University, agreed that McDermott Delaware could vote its shares of International stock:

---

**2.** Mr. Durling has been a practicing lawyer in Panama since 1955 and is currently completing what will be the first treatise on the subject of Panama Corporate Law.

Regarding the second item of your consultation, the Corporation Law of Panama, Law 32 of February 26, 1927, does not contain any provision prohibiting a Panamanian corporation to vote the shares owned by another corporation in which the first corporation owns the majority of the shares.

\* \* \* \* \* \*

It is a principal of law that in matters of public law one can only do what is expressly allowed by the law; while in private law all acts not prohibited by law can be performed. This principal is acknowledged by Law 32 of 1927, numeral 11 Artile [sic] 19, when it states that the corporation may perform all types of legal businesses even if they are not contained in the objects of the corporation, specified in its Articles of Incorporation or its Amendments.

I have already stated in the preceding paragraphs that Article 35 of Cabinet Decree No. 247 is not applicable to corporations in general, but only to those registered with the National Securities Commission and to those who sell their shares within the national territory, in accordance to the provisions of Article 37 of said Decree No. 247.

*Therefore, I am of the opinion that, in the absence of an expressed prohibition, a Panamanian corporation may vote the shares owned by another corporation in which the first owns the majority of shares.*

Appendix to Appellant's Opening Brief at A–200 to A–201 (original) and A–206 to A–207 (English translation) (Emphasis added).

Finally, Dr. Edgardo Molina Mola, Dean of the Law School of the National University of Panama (Universidad de Panama), opined that McDermott Delaware could vote its International shares:

In item 2 of your letter, you consult me if the corporation law of Panama forbids Panamanian corporations to vote the shares owned by another corporation in which the first owns the majority of shares.

I have examined in detail the provisions of Law 32 of February 26, 1927 which regulates the formation of corporations in Panama, and have not found any expressed prohibition which may be applicable to the situation presented by you. I do find some provisions, as that of Article 15, which allow corporations to acquire their own shares, which may be kept or sold by the corporation, or redeemed by the agreement of the Board of Directors, pursuant to Article 16. The only prohibition I have found is that contained in Article 17, but the same refers to those cases when the corporation acquires its own shares of stock. In these cases, such shares cannot be directly or indirectly represented in the Stockholders meetings.

\* \* \* \* \* \*

Therefore, I must conclude that, in the absence of an express prohibition by the law, a Panamanian corporation may vote the shares owned by another corporation in which the first owns the majority of the shares.

Appendix to Appellant's Opening Brief at A–212 (original) and A–217 (English translation).

This evidence of Panamanian law is uncontroverted. Plaintiffs have offered no proof whatever on the subject. Instead, they rely on *Norlin.* By letter dated March 9, 1987, McDermott informed the Court of a postargument change in the facts relevant to this appeal. McDermott International has recently registered with the National Securities Commission of Panama, thereby making Article 35 of Panamanian Cabinet Decree No. 247 applicable to the company. Thus, McDermott Delaware cannot now vote its International shares. This change in circumstances technically renders the appeal moot. Normally, we decline to decide moot issues. *Sannini v. Casscells,* Del.Supr., 401 A.2d 927, 930 (1979). However, where the question is of public importance, and its impact on the law is real, this Court has recognized an exception to the above rule. *Darby v. New Castle Gunning Bedford Educ. Ass'n.,* Del.Supr., 336 A.2d 209, 209 n. 1 (1975).

*See also Bailey v. State*, Del.Supr., No. 292, 1986, slip op. at 3–4 (April 20, 1987 [525 A.2d 582 (table)]) (Christie, C.J., for the Court *en banc*). Given the importance of this matter to Delaware corporation law, and the state in which it otherwise would be left, we are compelled to decide this case based on the facts presented to the trial court.

### II.

We note at the outset that if International were incorporated either in Delaware or Louisiana, its stock could not be voted by a majority-owned subsidiary. 8 *Del.C.* § 160(c)[3]; La.Rev.Stat.Ann. § 12:75(G).[4] No United States jurisdiction of which we are aware permits that practice.

Relying on *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255 (2d Cir.1984), the Court of Chancery concluded that Panama in effect would refrain from applying its laws under the facts of this case. On that basis, the trial court then concluded that since both Delaware and Louisiana law prohibit a majority-owned subsidiary from voting its parent's stock, the device was improper. We consider this an erroneous application of both Delaware and Panamanian law.

Our analysis requires a two-step inquiry. First, we must determine if Panamanian law, in the factual context addressed by the Court of Chancery, permits International to vote its own shares through the device of McDermott Delaware's ownership. If it does not, then the inquiry ends. However, if Panamanian law permits the practice, we must consider the multifaceted issues inherent in the application of the internal affairs doctrine.

### A.

■ It is apparent that under limited circumstances the laws of Panama permit a subsidiary to vote the shares of its parent. Article 35 of Panamanian Cabinet Decree No. 247 of July 16, 1970, which is part of the General Corporation Law of Panama, restricts the exercise of voting rights on shares of certain Panamanian corporations, but Article 37 limits the scope of Article 35 to "corporations registered in the National Securities Commission [of Panama] and those whose shares are sold on the market . . ." Opinion of Ricardo A. Durling, *supra* p. 5. Based on the facts before the Court of Chancery, it is undisputed that International was not required to register, nor had it registered, with the National Securities Commission. Further, International's shares were not "sold on the market," as that term is defined by the Attorney General of Panama.[5] Reading Articles 35 and 37 together, it is apparent that Article 35's prohibition did not apply to International.

### B.

■ Plaintiffs argue that McDermott Delaware may not vote shares held in International, since Panama law does not expressly permit such corporate action. Further, they contend, and the Vice Chancellor ruled, that Article 37 simply provides "that where a Panama corporation's shares are not registered in Panama and not publicly

3. 8 *Del.C.* § 160(c) provides:
   Shares of its own capital stock belonging to the corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the corporation, shall neither be entitled to vote nor be counted for quorum purposes. Nothing in this section shall be construed as limiting the right of any corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

4. La.Rev.Stat.Ann. § 12:75(G) provides:
   *Neither* (1) treasury shares, nor (2) unissued shares, nor (3) shares of a parent corporation held by a subsidiary corporation in which the parent holds a majority of the shares entitled to vote for the election of directors, shall be voted, or counted in calculating the voting power of shareholders of a corporation.

5. An opinion of the Executive Director of the National Commission of Securities of Panama, dated May 2, 1984, states that the phrase "sold on the market" requires that shares of a Panamanian corporation be made in Panama to more than ten persons annually. None of International's shares had been so traded. Appendix to Appellant's Opening Brief at A–185 to A–188 (original) and A–189 to A–192 (English translation).

traded in Panama (i.e., such as the shares of International at bar) the laws of Panama will not be imposed on that corporation." According to plaintiffs, this means that Panama has "declined to assert its own jurisdiction and laws on Panamanian corporations that choose to limit their contact with Panama."

We cannot accept either of those propositions. The uncontroverted evidence clearly and unambiguously rejects the contention that Panamanian law prohibits all conduct not otherwise expressly permitted. All three legal experts agreed that McDermott Delaware could vote the shares it held in International. Further, Dean Fernandez specifically stated that it "is a principle of law that in matters of public law one can only do what is expressly allowed by the law; while in private law all acts not prohibited by law can be performed." This fully accords with basic principles of Delaware corporate law. *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 957 (1985); *See Providence and Worcester Co. v. Baker*, Del.Supr., 378 A.2d 121, 123–24 (1977).

### C.

▮ We also reject plaintiffs' contention that Article 37 articulates Panama's intent to decline jurisdiction over corporations which are neither registered with the National Securities Commission nor sell shares on the Panamanian "market." Were this the intent of the Panamanian Cabinet Decree, the language of Article 37 would not expressly limit its applicability to Articles 34, 35 and 36.

While offering no proof on this point, plaintiffs cite *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255 (2d Cir.1984) for the proposition that:

> In this case, Panama apparently would refrain from applying its own law to the transactions under scrutiny, because appellant does not meet the criteria of Article 37, as interpreted by the General Attorney. In essence, Panama has made a determination that its interest in Norlin's affairs is insufficient to warrant the ap-

plication of Panamanian law to this dispute.

744 F.2d at 264.

The *Norlin* decision, however, provides no rationale for this result, nor does it analyze the express limitation of applicability, contained in the opening clause of Article 37, to Articles 34, 35 and 36. Such analytical omissions materially undermine its persuasive effect. Moreover, the facts of *Norlin* are quite different from those here. Norlin Corp., confronted by a hostile takeover bid from Piezo Electric Products, Inc., transferred 828,395 shares of voting stock to its wholly-owned subsidiary. Both Norlin and the subsidiary were incorporated in Panama. Piezo alleged that the stock transfer violated, *inter alia*, Panama and New York law. Evidently applying a "cluster of significant contacts" theory, the Second Circuit, *interpreting New York law*, determined that an automatic application of the internal affairs doctrine was inappropriate:

> Norlin's contacts with the State of New York are far from insubstantial. The company's principal place of business is located within the state, and its board of directors meets here. The resolution approving the contested stock issuances were adopted in this state, and the company stock has been traded on the NYSE. Whether these contacts are sufficient for a New York court to apply New York law is in our view, a question that does not lend itself to a simple answer. We need not, however, grapple with it to resolve the present inquiry. The principals compelling a foreign state to apply foreign law come into play only when a legitimate and substantial interest of another state would thereby be served .... Conversely, when the interest of only one state are truly involved, the purported conflict is purely illusory. Thus, there is no reason why the law of the foreign state should not control ....

*Norlin*, 744 F.2d at 263–64 (citations omitted).

To buttress the application of a New York statute prohibiting the issuance of voting stock to a majority-owned subsidi-

ary, the Second Circuit concluded that Panama would refrain from applying its own law to the transaction. *Id.*

We decline to follow *Norlin* for several reasons. First, we reject the notion that Panamanian law is inapplicable on the basis of some factually unsupported theory of abstention. *Cf. Hart v. General Motors Corp.*, N.Y.App.Div., 129 A.D.2d 179, 517 N.Y.S.2d 490 (1987). Second, *Norlin* applies the law of New York because of the defendants' substantial contacts with that State.[6] Third, *Norlin* neither cited nor distinguished the earlier contrary decision of *Hausman v. Buckley*, 299 F.2d 696 (2d Cir.), *cert. denied*, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962), although both opinions were authored by the same member of the Court. *Hausman* holds that the right of shareholders to bring a derivative action on behalf of a corporation is determined by the laws of the state of its incorporation. The Second Circuit rejected an argument that New York courts would refuse to apply the internal affairs doctrine for reasons of public policy. *Id.* at 705. Significantly, *Hausman* recognized that the doctrine was "well established" and had been applied "repeatedly" to determine matters governing the relations of stockholders and corporations *inter se. Id.* at 702. The failure to even mention *Hausman* can only further undermine *Norlin's* persuasiveness.

Finally, *Norlin* arose in the context of a hostile takeover threat. The *Norlin* board issued over 800,000 shares of voting stock to a subsidiary, as the final step in a series of transactions designed to place 49% of the voting power in the friendly hands of the board of directors, and with the clear intention of thwarting any hostile bids for control of the company.[7] In contrast, McDermott Delaware emerged from the Reorganization holding only 10% of International's voting power, and there is no serious suggestion that this circumstance, alone, would thwart a determined bidder.

Given the uncontroverted evidence of Panamanian law, establishing that a Panamanian corporation may place voting shares in a majority-owned subsidiary under the limited circumstances provided by Article 37, we turn to the fundamental issues presented by application of the internal affairs doctrine.[8]

### III.

Internal corporate affairs involve those matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders. *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982). Restatement (Second) of Conflict of Laws § 313, Comment a (1971). It is essential to distinguish between acts which can be performed by both corporations and individuals, and those activities which are peculiar to the corporate entity.

▮▮▮ Corporations and individuals alike enter into contracts, commit torts, and deal in personal and real property. Choice of law decisions relating to such corporate

---

6. Putting aside the question whether Delaware would apply a grouping of contacts or most significant relationship test in other areas of the law, International has no contacts whatever with Delaware. Given that circumstance, and Delaware's long adherence to the internal affairs doctrine, there is no basis for us to impose our own law upon a foreign corporation.

7. While International cites some rather insubstantial federal tax savings as the motivating factor for issuing voting shares to McDermott Delaware, we recognize the potential of McDermott Delaware's voting interest to aid International in a hostile fight for control. However, we do not rest our decision solely on the justifications urged by International, i.e., the possible tax savings provided by the reorganization.

8. Regarding proof of foreign law, Rule 202(e) of the Delaware Uniform Rules of Evidence provides:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under these rules. The court's determination shall be treated as a ruling on a question of law.

This rule has no counterpart in either the Federal Rules of Evidence or the Uniform Rules of Evidence.

activities are usually determined after consideration of the facts of each transaction. *See* Reese and Kaufman, *The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit,* 58 Column.L.Rev. 1118, 1121 (1958) (hereinafter "Reese and Kaufman"). In such cases, the choice of law determination often turns on whether the corporation had sufficient contacts with the forum state, in relation to the act or transaction in question, to satisfy the constitutional requirements of due process. The internal affairs doctrine has no applicability in these situations. Rather, this doctrine governs the choice of law determinations involving matters *peculiar* to corporations, that is, those activities concerning the relationships *inter se* of the corporation, its directors, officers and shareholders.

■ The internal affairs doctrine requires that the law of the state of incorporation should determine issues relating to internal corporate affairs. *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983). Under Delaware conflict of laws principles and the United States Constitution, there are appropriate circumstances which mandate application of this doctrine.

### A.

■ Delaware's well established conflict of laws principles require that the laws of the jurisdiction of incorporation—here the Republic of Panama—govern this dispute involving McDermott International's voting rights. *Beard v. Elster,* Del.Supr., 160 A.2d 731, 735 (1960); *Elster v. American Airlines, Inc.,* Del.Ch., 100 A.2d 219, 224–25 (1953); *Ringling v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc.,* Del. Ch., 49 A.2d 603, 607 (1946), *modified,* Del. Supr., 53 A.2d 441 (1947); *Mau v. Montana Pacific Oil Co.,* Del.Ch., 141 A: 828, 831

(1928); *Bruch v. National Guarantee Credit Corp.,* Del.Ch., 116 A. 738, 744 (1922).[9]

The traditional conflicts rule developed by courts has been that internal corporate relationships are governed by the laws of the forum of incorporation. *See* Macey & Miller, *Toward an Interest-Group Theory of Delaware Corporate Law,* 65 Tex.L. Rev. 469, 495 (1987). As early as 1933, the Supreme Court of the United States noted:

It has long been settled doctrine that a court—state or federal—sitting in one state will, as a general rule, decline to interfere with, or control by injunction or otherwise, the management of the internal affairs of a corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of the domicile

· · · ·

*Rogers v. Guaranty Trust Co. of New York,* 288 U.S. 123, 130, 53 S.Ct. 295, 297, 77 L.Ed. 652 (1933) (citations omitted).

However, in *Western Air Lines, Inc. v. Sobieski,* Cal.App., 191 Cal.App.2d 399, 12 Cal.Rptr. 719 (1961), a California court upheld an order of the California Commissioner of Corporations directing a Delaware corporation having major contacts with California to follow the cumulative voting requirements imposed by California law. After the *Western Air* decision, commentators noted that the case signaled the alleged start of a "conflicts revolution." *See* Kozyris, *Corporate Wars and Choice of Law,* 1985 Duke L.J. 1 (hereinafter "Kozyris"); Kaplan, *Foreign Corporations and Local Corporate Policy,* 21 Vand.L.Rev. 433 (1968) (hereinafter "Kaplan"). The "new" conflicts theory weighs the interests and policies of the forum state in determining whether the law of the forum—lex fori—should be applied. *See* Restatement (Second) of Conflict of Laws, §§ 302–06, 309 (1971). Thus, the *Western Air Lines*

---

9. As the Supreme Court of the United States just recently observed:

It thus is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares. A State has an interest in promoting stable relationships among parties involved in the corporations it charters....

*CTS Corp. v. Dynamics Corp. of America,* —— U.S. ——, 107 S.Ct. 1637, 1650–51, 95 L.Ed.2d 67 (1987) (reversing 794 F.2d 250).

case "was to be the harbinger of a new conflicts approach in corporate law that would limit or perhaps discard the lex incorporationis." Kozyris, *supra* at 17.

A review of cases over the last twenty-six years, however, finds that in all but a few, the law of the state of incorporation was applied without any discussion. *Id.* at 17–18. In fact, twenty-six years after *Western Air* the following statement remains apt:

> The umbilical tie of the foreign corporation to the state of its charter is usually still religiously regarded as conclusive in determining the law to be applied in intracorporate disputes. The fundamental reexamination of the nature of conflict of laws over the past few years has virtually left foreign corporation matters remaining as a pocket of the past in a subject area which has otherwise been characterized by free inquiry, change and flux.

Kaplan, *supra* at 464.[10]

The policy underlying the internal affairs doctrine is an important one, and we decline to erode the principle:

> Under the prevailing conflicts practice, neither courts nor legislatures have maximized the imposition of local corporate policy on foreign corporations but have consistently applied the law of the state of incorporation to the entire gamut of internal corporate affairs. In many cases, this is a wise, practical, and equitable choice. It serves the vital need for a single, constant and equal law to avoid the fragmentation of continuing, interdependent internal relationships. The lex incorporationis, unlike the lex loci delicti, is not a rule based merely on the priori concept of territoriality and on the desirability of avoiding forum-shopping. It validates the autonomy of the

parties in a subject where the underlying policy of the law is enabling. It facilitates planning and enhances predictability. In fields like torts, where the typical dispute involves two persons and a single or simple one-shot issue and where the common substantive policy is to spread the loss through compensation and insurance, the preference for forum law and the emphasis on the state interest in forum residents which are the common denominators of the new conflicts methodologies do not necessarily lead to unacceptable choices. By contrast, applying local internal affairs law to a foreign corporation just because it is amenable to process in the forum or because it has some local shareholders or some other local contact is apt to produce inequalities, intolerable confusion, and uncertainty, and intrude into the domain of other states that have a superior claim to regulate the same subject matter....

Kozyris, *supra* at 98.

### B.

■ Given the significance of these considerations, application of the internal affairs doctrine is not merely a principle of conflicts law. It is also one of serious constitutional proportions—under due process, the commerce clause and the full faith and credit clause—so that the law of one state governs the relationships of a corporation to its stockholders, directors and officers in matters of internal corporate governance. The alternatives present almost intolerable consequences to the corporate enterprise and its managers. With the existence of multistate and multinational organizations, directors and officers have a significant right, under the fourteenth amendment's due process clause, to know what law will be applied to their actions.

---

**10.** For an excellent discussion of the post-*Western Airlines* application of the internal affairs doctrine in the context of takeover litigation, see Kozyris, *supra* at 18–19. Since Professor Kozyris' article was published prior to the release of the *Norlin* opinion, the author did not have the opportunity to note that *Norlin* is the only known case which ignored the internal affairs doctrine in the context of corporate takeover litigation. Suffice it to say that in many leading cases the internal affairs doctrine was treated as axiomatic. *See Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 565–68 (6th Cir.1982); *Dan River, Inc. v. Icahn,* 701 F.2d 278, 280–83, 291–92 (4th Cir.1983); *Lewis v. Knutson,* 699 F.2d 230, 235 (5th Cir.1983); *Panter v. Marshall Field & Co.,* 646 F.2d 271, 277–78, 293 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Wylain, Inc. v. TRE Corp.,* Del.Ch., 412 A.2d 338, 344 (1980).

Stockholders also have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs. That is particularly so here, given the significant fact that in the McDermott Group reorganization, and after full disclosure, 89.59% of the total outstanding common shares of McDermott Delaware were tendered in the exchange offer. *Compare Norlin.* Thus, by an overwhelming choice those stockholders received shares in International, and thereby selected the laws of Panama to govern *inter se* the corporate relations between themselves, International, its directors, officers and agents. (*See* note 1, *supra.*) Such issues have been the subject of litigation and scholarly discussions for decades. However, an attitude has developed in some quarters which exalts local interests over more fundamental doctrines. We approach such teachings with reservations.

■ Under the commerce clause *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), determined that a state may regulate interstate commerce indirectly, but emphasized that the burden placed upon interstate commerce may not be excessive in relation to the local interests served by the regulation. In *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Supreme Court ruled that under the commerce clause a state "has no interest in regulating the internal affairs of foreign corporations." *Id.* at 645–46, 102 S.Ct. at 2642. If that is so, then a court or state which attempts to displace the internal affairs doctrine carries a heavy burden to justify its actions.

■ The recent decision in *CTS Corp. v. Dynamics Corp. of America,* —— U.S. ——, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), (reversing 794 F.2d 250), seems to support this interpretation of *MITE:*

This Court's recent Commerce Clause cases also have invalidated statutes that adversely may affect interstate commerce by subjecting activities to inconsistent regulations ... The Indiana Act poses no such problem. *So long as each State regulates voting rights only in the corporations it has created, each corporation will be subject to the law of only one state.* No principal of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders ... This beneficial free market system depends at its core upon the fact that a corporation—except in the rarest situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the state of its incorporation.

*CTS Corp.,* —— U.S. at ——, 107 S.Ct. at 1649 (citations omitted) (emphases added).[11] Thus, we conclude that application of the internal affairs doctrine is mandated by constitutional principles, except i⁻ "the rarest situations." [12]

---

11. *See United Air Lines, Inc. v. Illinois Commerce Commission,* Ill.Supr., 32 Ill.2d 516, 207 N.E.2d 433, 437–38 (1965) (commerce clause prohibits Illinois from requiring that a Delaware corporation comply with various requirements concerning a stock issuance); *United Air Lines, Inc. v. Nebraska State Ry. Comm'n,* Neb. Supr., 172 Neb. 784, 112 N.W.2d 414, 422 (1961); *State ex rel Utilities Comm'n v. Southern Bell Tel. and Tele. Co.* N.C.Supr., 288 N.C. 201, 217 S.E.2d 543, 549 (1975); *Panhandle Eastern Pipe Line Co. v. Public Util. Comm'n,* Ohio Supr., 56 Ohio St.2d 334, 383 N.E.2d 1163, 1169–70 (1978).

12. *CTS Corp. v. Dynamics Corp. of America,* provides strong support for a conclusion that the commerce clause mandates that a state apply the internal affairs doctrine to disputes involving corporations organized under the laws of a sister state. *CTS Corp.* involved a challenge to Indiana's second generation corporate takeover statute. The Indiana statute applies only to Indiana corporations, and is thus distinguishable from the first generation of statutes struck down in *Edgar v. MITE Corp.,* which purported to govern the internal affairs of foreign corporations. In *MITE,* the Supreme Court held that Illinois violated the commerce clause by burdening interstate commerce when regulating the internal affairs of a foreign corporation. In *CTS Corp.,* the Court ruled that a state does not violate the commerce clause, notwithstanding heavy burdens imposed upon interstate commerce, if a state is merely regulating the internal affairs of its own corporations.

■ In the early part of the twentieth century, the internal affairs doctrine was deemed to have constitutional support under the full faith and credit clause.[13] *See Broderick v. Rosner,* 294 U.S. 629, 643, 55 S.Ct. 589, 593, 79 L.Ed. 1100 (1935); *Converse v. Hamilton,* 224 U.S. 243, 256–57, 32 S.Ct. 415, 418–19, 56 L.Ed. 749 (1912). However, in 1935 the Supreme Court developed a balancing test to be used when evaluating whether full faith and credit was applicable. *Alaska Packers Ass'n v. Industrial Accident Comm'n,* 294 U.S. 532, 55 S.Ct. 518 (1935). A party bringing a full faith and credit claim thereafter bore the burden of establishing that conflicting interests of a foreign state were superior to those of the forum state. *Id.* at 547, 55 S.Ct. at 523–24.

*Order of United Commercial Travelers of America v. Wolfe,* 331 U.S. 586, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947) is the last Supreme Court decision which mandates application of the law of the state of organization to an entity's internal dealings under the full faith and credit clause. In *Wolfe,* the Supreme Court held that full faith and credit required that a dispute involving the internal affairs of a fraternal benefit society be governed by the laws of the state where the society was formed. *Id.* at 623–25, 67 S.Ct. at 1373–74. Although we recognize that there are lingering uncertainties concerning the vitality of *Wolfe,*[14] we believe that full faith and credit commands application of the internal affairs doctrine except in the *rare* circumstance where national policy[15] is outweighed by a significant interest of the forum state in the corporation and its shareholders. Reese and Kaufman, *supra* at 1141.

■ Addressing the facts originally presented to the trial court and to us, we must conclude that due process and the commerce clause, in addition to principles of Delaware conflicts law, mandate reversal. Due process requires that directors, officers and shareholders be given adequate notice of the jurisdiction whose laws will ultimately govern the corporation's internal affairs. Under such circumstances, application of *8 Del.C.* § 160(c) to International would unfairly and, in our opinion, unconstitutionally, subject those intimately involved with the management of the corporation to the laws of Delaware.

■ Moreover, application of Section 160(c) to International would violate the commerce clause. Delaware and Panama law clearly differ in their treatment of a subsidiary's voting rights under the facts originally presented here. For Delaware now to interfere in the internal affairs of a foreign corporation having no relationship whatever to this State clearly implies that

13. This clause directs that "Full Faith and Credit shall be given in each State to the Public Acts, Records, and judicial Proceedings of every other State ..." U.S. Const. art. IV, § 1.

14. *See Allstate Insurance Co. v. Hague,* 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981); *Wilson v. Louisiana-Pacific Resources, Inc.,* Cal. App., 138 Cal.App.3d 216, 187 Cal.Rptr. 852, 856–58 (1982) (contra). *See also* Kaplan, *Foreign Corporations and Local Corporate Policy,* 21 Vand.L.Rev. 433, 446–47 (1968). However, Professor Kaplan relies on *Clay v. Sun Insurance Office, Ltd.,* 377 U.S. 179, 84 S.Ct. 1197, 12 L.Ed.2d 229 (1964) to support his assertion that *Wolfe* will not be extended to general business corporations. In *Clay,* plaintiff purchased an insurance policy which contained a one year statute of limitations clause enforceable under existing Illinois law. The Supreme Court held that a Florida statute requiring a minimum five year statute of limitations period was applicable, in an action brought in Florida, thus striking the one year limitation period provided by the Illinois contract. Petitioner was not a "shareholder" of respondent insurance company, and this case in no way involves the internal affairs of an organization—i.e., those matters peculiar to the officers, directors and shareholders of an organization acting in such capacities. In stark contrast, *Wolfe* involved the rights of a member of a fraternal benefit society, in his capacity as a member (shareholder) as against the benefit society (corporation). The Supreme Court held that the full faith and credit clause required that the law of the state wherein the benefit society was established be applied in litigation between the member and the society.

15. *See, e.g.,* Kozyris, *supra* at 34: "Elementary considerations of predictability, practicality, and equality call for both corporate governance and the common rights and obligations of shareholders to be subject to a single law. Full faith and credit gives primacy to the statute chosen by the parties with the consent of the state of incorporation.

International can be subjected to the differing laws of all fifty states on various matters respecting its internal affairs. Such a prohibitive burden has obvious commerce clause implications, and could not pass constitutional muster. The substantial effect that would impose on interstate commerce triggers the *Pike v. Bruce Church, Inc.* balancing test. Since a state has no interest in regulating the internal affairs of a foreign corporation under *MITE*, Delaware has nothing left with which to counterbalance the burden that application of Section 160(c) on International would impose on interstate commerce. Given all the circumstances, the trial court's ruling cannot stand.[16]

### IV.

■ Plaintiffs protest the issuance of voting stock to McDermott Delaware on public policy grounds, relying on the following statement from *Norlin:*

> [The] statutes seek to safeguard minority shareholders from management attempts at self-perpetuation. If cross-ownership and cross-voting of stock between parents and subsidiaries were unregulated, officers and directors could easily entrench themselves by exchanging a sufficient number of shares to block any challenge to their autonomy....

744 F.2d at 262 (citation omitted).

In that regard, Delaware law prohibits cross-voting of stock by majority-owned subsidiaries of Delaware corporations. 8 *Del.C.* § 160(c). But here, we are called upon to apply the laws of Panama to a Panamanian corporation having no contacts with Delaware. We are not altering existing law governing Delaware corporations.

On the record before the Court of Chancery, we are not faced with some "Draconian" measure for the effectuation of a scheme designed solely to entrench existing management to the detriment of the corporation's shareholders. See *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr.,

493 A.2d 946, 955 (1985). The facts here do not support an entrenchment claim. The size of the voting interest placed in McDermott Delaware, its stated principal purpose being for tax advantages, and the timing of the transaction, all sustain this conclusion. In short, there was no threat of any kind which implicated the policies discussed by us in *Unocal. Id.* at 954–59. If such issues should arise in a takeover context, they can be addressed in a proper way and at the proper time. *See Moran v. Household International, Inc.*, Del.Supr., 500 A.2d 1346, 1357 (1985).

In conclusion, the trial court erred as a matter of law in ignoring the uncontroverted Panamanian law, and in applying Delaware and/or Louisiana law to the internal affairs of International contrary to established Delaware law and important constitutional principles. Accordingly the judgment of the Court of Chancery is REVERSED.

---

**16.** However, we recognize that as a Panamanian corporation, McDermott Internation's rights here do not derive from the full faith and credit clause, which applies only to the laws of American states.