## In re FIRST INTERSTATE BANCORP CONSOLIDATED SHAREHOLDER LITIGATION

### No. 14623.

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 11, 1998.
Decided: Oct. 7, 1998.

---

7. 11 *Del. C.* § 203.

8. *Daniels v. State*, Del.Supr., 538 A.2d 1104, 1110 (1988).

9. *Id.*

10. *Hudson Farms, Inc. v. McGrellis*, Del. Supr., 620 A.2d 215, 217 (1993).

11. *Id.*

R. Bruce McNew, of Taylor, Gruver & McNew, Greenville, of counsel: Joseph W. Cotchett, Marie Seth Weiner, of Cotchett,

Pitre & Simon, Burlingame, CA, Maxwell M. Blecher, Harold R. Collins, Jr., of Blecher & Collins, P.C., Los Angeles, CA, for Plaintiff and the Class.

Steven J. Rothschild, Robert S. Saunders, of Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, for Defendant First Interstate and the Management Directors: William S. Randall and William E.B. Siart.

Jon E. Abramczyk, of Morris, Nichols, Arsht & Tunnell, Wilmington, of counsel: Richard H. Borow, P.C., David Siegel, of Irell & Manella, LLP, Los Angeles, CA, for the Defendant Non–Management Former Directors: John E. Bryson, Jewel Plummer Cobb, Ralph P. Davidson, Myron DuBain, Don C. Frisbee, George M. Keller, Thomas L. Lee, William F. Miller, Steven B. Sample, Forrest N. Shumway, Richard J. Stegemeier and Daniel M. Tellep.

Michael D. Goldman, Stephen C. Norman, Gregory M. Johnson, of Potter, Anderson & Corroon, LLP, Wilmington; of counsel: Richard F. Ziegler, Howard S. Zelbo, of Cleary, Gottlieb, Steen & Hamilton, New York City; Brad W. Seiling, of Manatt, Phelps & Phillips, Los Angeles, CA, for Defendant First Bank System, Inc.

## OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

These consolidated cases arise out of a merger agreement between defendant First Interstate Bancorp ("First Interstate")[1] and defendant First Bank System, Inc. ("First Bank"),[2] approved by the defendant directors of First Interstate[3] on November 6, 1995. This agreement was later terminated for a more favorable transaction with Wells Fargo & Co. ("Wells Fargo"). Before the Court are defendants' motions to dismiss plaintiff's "First Amended Complaint of Non–Moot Claims" filed on April 15, 1998 (the "April Amended Complaint") for failure to state a claim upon which relief can be granted. For the reasons set forth herein, the motions will be granted.

## II. BACKGROUND

### A. Factual History[4]

On or about October 18, 1995, Wells Fargo contacted First Interstate and presented an unsolicited merger proposal in which 0.625 shares of Wells Fargo common stock would be exchanged for each share of First Interstate common stock, a transaction then valued at $10.2 billion. This proposal represented a premium offer over the then current market value of First Interstate's common stock.

In response to this proposal, First Interstate announced that its board of directors had authorized its management to explore alternatives to the Wells Fargo proposal. In late October, Wells Fargo announced that it was moving forward with its merger proposal by seeking approval under feder-

---

1. First Interstate was a Delaware corporation and a holding company. Its principal asset was First Interstate Bank, which is headquartered in Los Angeles, California.

2. First Bank System, Inc., now known as U.S. Bancorp, is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

3. The First Interstate director defendants are William E.B. Siart, John E. Bryson, Jewel Plummer Cobb, Ralph P. Davidson, Myron DuBain, Don C. Frisbee, George M. Keller, Thomas L. Lee, William F. Miller, William S. Randall, Steven B. Sample, Forrest N. Shumway, Richard J. Stegemeier and Daniel M. Tellep. At all relevant times, Mr. Siart and Mr. Randall were officers as well as directors; Mr. Siart, President, Chief Executive Officer and Chairman of the Board, and Mr. Randall, Executive Vice President and Chief Operating Officer.

4. Solely for the purpose of deciding these motions to dismiss, I accept the well pleaded allegations of fact in the April Amended Complaint as true. *In re Tri–Star Pictures, Inc., Litig.*, Del.Supr., 634 A.2d 319, 326 (1993).

al antitrust laws. At the same time, First Interstate began discussions with other potential acquirers, including Norwest Bancorp, Banc One Corp and First Bank. Not to be dissuaded, on November 5, 1995, Wells Fargo increased the exchange ratio in its bid to 0.65, thus increasing the value of its bid (as of that date) to $10.9 billion, or $136.91 per share.

On November 6, 1995, First Interstate announced that its board of directors had rejected Wells Fargo's latest bid, and had unanimously approved a merger with First Bank. The First Bank merger was valued at $9.88 billion, or $129.55 per share. This per share value was below the market value of First Interstate common stock on that date and below the value offered by Wells Fargo. First Interstate explained that the reasoning for accepting the lower bid was based on the opportunity for growth, as compared to the cost-cutting that a merger with Wells Fargo would require.

As part of their merger agreement, First Interstate and First Bank approved break-up fee and reciprocal stock option agreements which threatened to make third-party acquisitions more expensive and difficult. The break-up fee consisted of reciprocal termination fee letters providing that, if either party terminated the merger agreement by breach or withdrawal, $25 million would be immediately payable to the wronged party and $75 million would be payable if an alternative transaction was undertaken within a specified period of time. The reciprocal stock option agreements were to be exercisable under the same circumstances as the termination fee and were capped a maximum value of $100 million. First Interstate also agreed to exempt the First Bank merger agreement from the operation of its shareholder rights plan, but the plan remained in place as to Wells Fargo and any other potential bidder.

The First Interstate board of directors also instituted "golden, silver and tin parachute" severance packages for substantial-

ly all First Interstate officers, employees and directors. Allegedly, these arrangements posed a greater potential expense to Wells Fargo (in the event it succeeded in acquiring First Interstate) than to First Bank, as the First Bank merger was not expected to result in nearly as many lay-offs of First Interstate personnel as the competing Wells Fargo proposal.

On November 13, 1995, Wells Fargo announced its intention to commence an any-and-all offer to exchange two-thirds of a share of Wells Fargo stock for each outstanding share of First Interstate's common stock. This bid was valued at $10.6 to $10.9 billion.

On November 20, 1996, First Interstate announced that its board of directors had rejected the latest Wells Fargo bid as not being in the best interests of the corporation and that it would be proceeding toward the consummation of the First Bank merger. The First Interstate directors recommended that First Interstate stockholders not tender shares into the Wells Fargo offer.

Over the next weeks, despite a growing disparity between the value of the two competing proposals resulting from changes in the relative market values of First Bank and Wells Fargo common stock, First Interstate and First Bank continued to move toward consummation of their merger. By January 19, 1996, the negative spread between the First Bank bid and the Wells Fargo bid stood at $18.73 per share, and had been as great as $19.35 on January 15, 1996. In addition, the First Bank bid had decreased in value from $137.80 on November 19, 1995, to $126.10, while the Wells Fargo bid had increased from $141.17 on November 19, 1995 to $144.83.

By this time, the SEC had taken a definitive position that if the First Interstate/First Bank merger was accounted for as a pooling of interest, First Bank, as the surviving entity, would be required to suspend for two years its stock repurchase

program. The April Amended Complaint alleges that First Bank's prospective inability to continue its "massive share repurchase program" after completion of the First Interstate merger "had a significant and detrimental impact upon the interest, desire and ability of First Bank to enter into the merger."

On January 19, 1996, First Interstate informed First Bank that, while still interested in consummating the First Interstate/First Bank merger, its board of directors had authorized management to enter into discussions with Wells Fargo. First Bank was asked to increase its bid, but declined to do so. On January 22, 1996, First Bank filed a complaint for tortious interference against Wells Fargo. The same day, counsel for First Bank and Wells Fargo began negotiating a three-party agreement regarding the break-up fee and stock option payments that would be triggered by a termination of the First Interstate/First Bank merger agreement. By January 23, 1996, the parties reached an agreement providing for First Bank's receipt of $125 million immediately on termination of that agreement and $75 million upon the closing of a First Interstate/Wells Fargo transaction (the "Settlement Agreement"). Pursuant to the Settlement Agreement, the parties executed mutual releases and dismissed their various suits against one another.

In view of the likelihood of a transaction with Wells Fargo, the First Interstate board of directors augmented the severance packages approved earlier. As modified, the total value of the packages exceeded $100 million. Because the First Interstate severance benefits were more generous than those Wells Fargo had proposed for its own employees, Wells Fargo also altered its severance packages to conform to those established by First Interstate. In addition, First Interstate provided severance compensation to each First Interstate director whose board seat would be lost as a result of the Wells Fargo merger.[5] Wells Fargo implemented similar provisions.[6]

On January 23, 1996, the defendant directors approved the First Interstate/Wells Fargo transaction. Plaintiff Bradley tendered his shares in the ensuing exchange offer and did not object to or seek to enjoin the merger of Wells Fargo and First Interstate. That merger was completed in due course, after the receipt of necessary stockholder and governmental approvals.

### B. Procedural History

The first complaint in this action was filed on October 18, 1995, the day after Wells Fargo publicly announced its unsolicited offer. On October 27, 1995, the Court ordered the consolidation of all then-pending litigation (the "Consolidated Action"). The plaintiffs in the Consolidated Action (the "Consolidated Plaintiffs") eventually filed an amended complaint attacking the First Interstate/First Bank merger agreement; challenging among other things, the termination fee and reciprocal stock option agreements, and the selective operation of the "poison pill" rights plan in preventing consummation of the Wells Fargo tender offer. Wells Fargo also filed a complaint against First Interstate and its directors.

In late November 1995, shortly after the announcement of the proposed First Interstate/First Bank merger, Timothy W. Bradley ("plaintiff Bradley") filed parallel lawsuits in state and federal courts in California also attacking the proposed First Interstate/First Bank merger. On January 23, 1996, the First Interstate/First Bank merger terminated, and a transaction with Wells Fargo was arranged.

---

5. Non-officer directors who were not invited to join the Wells Fargo board of directors were to receive $26,000 for each year, up to twenty, served as a director.

6. Directors giving up their seats were to receive $28,000 for each year, up to ten, served as a director.

Since the amended complaint in the Consolidated Action principally attacked the First Interstate/First Bank merger, the termination of that merger and the approval of the First Interstate/Wells Fargo merger rendered moot many of the Consolidated Plaintiffs' claims for injunctive relief. Lead counsel in the Consolidated Action also determined that the remaining non-moot claims were not worth litigating. Therefore, an agreement was reached by which the parties to the Consolidated Action agreed to stipulate to: (i) the entry of an order certifying the class, (ii) a dismissal of the moot claims, and (iii) the entry of an order granting summary judgment to defendants on the non-moot claims. On February 27, 1996, the Court—believing the requested relief to be unopposed—signed orders certifying the class and granting summary judgment.

Plaintiff Bradley filed an action in this Court on January 26, 1996, presumably in contemplation of a resolution of his claims and his counsels' claims for fees as part of a global disposition of the litigation. Plaintiff Bradley quickly changed his mind about joining the Delaware litigation and, on February 1, 1996, filed a motion pursuant to Rule 41(a)(2) seeking a voluntary dismissal of his Delaware complaint in favor of litigating his claims in California state court.

Plaintiff Bradley's Delaware action was not formally made part of the Consolidated Action at that time (although plaintiff Bradley was included in the class of persons described in the class certification order). When plaintiff Bradley learned of the arrangement among the defendants and the Consolidated Plaintiffs, he objected and, on February 28, 1996, moved to vacate or alter the class certification order and to vacate the summary judgment order.

On March 4, 1996, the Court vacated the summary judgment order. A decision on the motion to vacate or amend the class certification order was stayed until briefing could occur. This Court also declined to address, at that time, plaintiff Bradley's motion for voluntary dismissal. On October 10, 1997, this Court, *inter alia*, (1) denied the Rule 41(a)(2) motion for dismissal, (2) consolidated plaintiff Bradley's Delaware action with the Consolidated Actions, (3) modified the class certification entered on February 27, 1996, appointing plaintiff Bradley as the class representative and his counsel as lead counsel for the purpose of pursuing the non-moot claims, and (4) directed plaintiff Bradley to file an amended complaint containing a definitive statement of the allegedly non-moot claims so that an orderly consideration of the defendants' motions for summary judgment could take place.

Plaintiff Bradley filed his first amended complaint of non-moot claims on December 8, 1997 ("December Amended Complaint"). On December 31, 1997, I granted defendants' request for leave to file motions to dismiss plaintiff Bradley's December Amended Complaint on grounds "that the accomplishment of the merger between Wells Fargo & Company and First Interstate Bancorp, ha[d] deprived the plaintiff and [members of] the class of standing to pursue claims derivatively on behalf of First Interstate." After the defendants moved to dismiss, plaintiff Bradley was given leave to replead, and filed the April Amended Complaint on April 15, 1998. Following briefing on the issue of standing, argument was held on the renewed motions to dismiss on July 28, 1998.

## C. Summary of the Complaint

Plaintiff Bradley's April Amended Complaint sets out six counts against the defendants. Counts One and Two are against First Interstate and the defendant directors for breach of their fiduciary duties. Specifically, plaintiff Bradley alleges that First Interstate and the defendant directors breached their fiduciary duties owed to the stockholders by: approving the reciprocal termination fee and stock option agreements, approving the Settlement Agreement which resulted in

the payment of $200 million to First Bank, and authorizing the modified severance packages. Plaintiff Bradley argues that these actions reduced the value of the merger consideration paid to First Interstate stockholders by at least $300 million. Count Three is against First Bank for aiding and abetting the alleged breach of fiduciary duties and conspiracy. Counts Four and Five are against all defendants, Count Four for unjust enrichment and Count Five for "money had and received." Count Six is against First Bank for violations of the California Business and Professions Code.

## III.  DISCUSSION

### A.  Are the Defendants Precluded from Raising the Issue of Standing?

█ I must first consider whether defendants' action in stipulating to the certification of the class in February 1996 should preclude them from arguing that the claims asserted in the April Amended Complaint are derivative in nature. Relying on arguments based on principles of collateral estoppel, judicial estoppel, waiver and related doctrines, plaintiff Bradley urges the Court to treat the February 1996 stipulated order of class certification as conclusively deciding the question of whether the claims asserted by plaintiff Bradley are direct or derivative in nature. I decline to do so.[7]

█ In certifying a class, this Court makes a determination that all of the procedural requirements for certification are met but does not address the merits of the complaint. *See Barbieri v. Swing–N–Slide Corp.*, Del.Ch., C.A. No. 14239, Steele, V.C., slip op. at 15, 1996 WL 255907 (May 7, 1996) ("At this stage, this

Court does not address the merits of [the] case. The decision of the Court focuses on the appropriateness of class certification, nothing more."). *See also Spark v. MBNA Corp.*, D.Del., 178 F.R.D. 431, 435 (1998) ("[I]n considering whether to certify a class, the court may not consider 'whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits.' ") (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). Thus, the February 1996 certification order was a determination of a procedural issue, and not a finding by the Court as to the nature of the underlying claims. The absence of a judicial determination of the issue here presented is fatal to plaintiff Bradley's arguments based on notions of collateral estoppel and judicial estoppel.[8] The certification order neither expressly nor by necessary implication carried with it any finding, representation or concession about the nature of the claims asserted.

█ Moreover, the record shows that defendants have consistently reserved (and did not waive) their right to argue the derivative nature of plaintiff Bradley's claims, both in briefing on the motion to vacate the class certification order and in argument before the court. *See, e.g.*, Brief of First Interstate Bancorp [et al.] in Opposition to Timothy W. Bradley's Motion to Vacate or Alter Class Certification, dated April 8, 1996, at 20; Transcript of Office Conference, dated Aug. 11, 1997, at 31. Indeed, defendants' counsel have consistently sought to advance motions to dismiss on those grounds. This evidence is inconsistent with a finding that defendants knowingly and voluntarily waived their right to move to dismiss this action on the

---

7. I note that First Bank was not a party to the stipulation and so could not be bound by the stipulated class order, even if others were.

8. The doctrine of judicial estoppel precludes a party "from asserting in a legal proceeding, a position inconsistent with a position previously taken by him in the same or in an earlier

proceeding." *Coates Int'l., Ltd. v. DeMott*, Del.Ch., C.A. No. 12346, Jacobs, V.C., slip op. at 9, 1994 WL 89018 (Feb. 4, 1994). In my opinion, defendants' consent to the certification of a class in February 1996 did not entail the "assertion" of a position inconsistent with the one now urged by them.

basis of standing. *Monterey Investments, Inc. v. Healthcare Properties, L.P.*, Del. Ch., C.A. No. 15519, Steele, V.C., slip op. at 15, 1997 WL 367038 (June 26, 1997) (defining the standard for waiver as "the voluntary and intentional relinquishment of a known right"). *Accord, American Family Mortgage Corp. v. Acierno*, Del. Supr., 640 A.2d 655 (1994) (ORDER) (noting the standard for waiver " 'implies knowledge of all material facts and intent to waive' " and the requirement that such facts be unequivocal) (quoting *Realty Growth Inv. v. Council of Unit Owners*, Del.Supr., 453 A.2d 450, 456 (1982)).

## B. Does Plaintiff Bradley Lack Standing?

Defendants contend that each count of the April Amended Complaint alleges derivative claims and that plaintiff Bradley lost standing to maintain those claims upon the consummation of the merger between First Interstate and Wells Fargo. *See Lewis v. Anderson*, Del.Supr., 477 A.2d 1040, 1049 (1984). Thus, there are two related questions: are the claims asserted in the April Amended Complaint derivative? and, if so, was plaintiff Bradley's standing to pursue them extinguished by the First Interstate/Wells Fargo merger?

*1. The Claims Asserted in the April Amended Complaint are Derivative.*

■ The distinction between derivative and individual actions turns on the existence of direct or "special" injury to the party alleging the wrongdoing. *Kramer v. Western Pac. Indus., Inc.*, Del.Supr., 546 A.2d 348, 351 (1988). The Supreme Court has adopted a two-prong test for determining whether such "special" injury exists:

> A special injury is established where there is a wrong suffered by plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote.

*In re Tri–Star Pictures, Inc., Litig.*, Del. Supr., 634 A.2d 319, 330 (1993).

■ If neither prong of this test can be met, then the claim is not direct. *Katell v. Morgan Stanley Group, Inc.*, Del.Ch., C.A. No. 12343, Chandler, V.C., slip. op. at 7, 1993 WL 10871 (Jan. 14, 1993). The Supreme Court has stated: "to have standing to sue individually . . . the Plaintiff must allege more that an injury resulting from a wrong to the corporation." *Kramer*, Del. Supr., 546 A.2d at 351. *See also Parnes v. Bally Entertainment Corp.*, Del.Ch., C.A. No. 15192, Chandler, C., slip. op. at 5, 1998 WL 51739 (Feb. 4, 1998) ("Absent a showing that the injury was a direct harm to the shareholder and independent of any wrong suffered by the corporation, plaintiff may not proceed with an individual claim."); *Bokat v. Getty Oil Co.*, Del.Supr., 262 A.2d 246, 249 (1970) ("[W]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively in behalf of the corporation.").

■ Despite the clarity with which the *Tri–Star* test can be articulated, the line distinguishing individual and derivative claims is sometimes narrow. The difficulty arising in the classification of claims as individual or derivative has led Delaware courts to reject the application of a *per se* rule in making this determination. Instead, this Court must look to "the 'nature of the wrong alleged' and the relief, if any, which could result if plaintiff were to prevail." *Kramer*, Del.Supr., 546 A.2d at 352 (citing *Elster v. American Airlines, Inc.*, Del.Ch., 100 A.2d 219, 221–23 (1953)). For guidance in determining the nature of the wrong involved, "a court must look to 'the body of the complaint, not to the Plaintiff's designation or stated intention.' " *Id.* (quoting *Lipton v. News Int'l, PLC*, Del.Supr., 514 A.2d 1075, 1078 (1986)).

With this framework in mind, I turn to an analysis of plaintiff Bradley's claims.

*a. Counts I & II—Against First Interstate and the Director Defendants for Breach of Fiduciary Duties.*

Counts I and II of the complaint are directed against First Interstate and its directors. They are divided, roughly, between claims relating to the First Bank merger agreement and claims relating to the decisions taken in conjunction with the approval of the Wells Fargo merger agreement. Count I states claims alleging that the directors breached their fiduciary duties by resisting the Wells Fargo unsolicited offer, approving the lower-valued First Bank merger agreement and its attendant termination fee and reciprocal stock option agreements, and using the First Interstate shareholders rights plan to stymie the Wells Fargo bid.[9] Count II contains claims attacking the defendant directors' approval of the Settlement Agreement (which resolved all claims arising under the termination fee and stock option agreements by agreeing to pay First Bank $200 million) and the directors' decision to enhance the First Interstate severance benefits (the golden, silver and tin parachutes) in conjunction with their approval of the agreement of merger with Wells Fargo. Both counts claim that, as a result of the matters alleged, plaintiff Bradley and the class suffered damages in the amount of at least $300 million: i.e., the amount First Interstate is alleged to have paid in severance benefits to its employees whose jobs were terminated in connection with the Wells Fargo merger ($100 million) and to First Bank as a result of the termination of the First Bank merger agreement. The relief sought from the defendant directors is the payment of money damages to the putative class.

Plaintiff Bradley argues that the payment of these amounts economically impaired First Interstate and consequently decreased the value of the consideration paid to the stockholders of First Interstate in the Wells Fargo merger. He argues, principally, that these claims meet the second prong of the *Tri–Star* test.[10]

I also conclude that the second prong of *Tri–Star* is not satisfied in this case. Delaware law is well-settled that claims arising from transactions involving corporate assets that allegedly operate to reduce the consideration received by stockholders in a merger are, in the absence of circumstances not present here, derivative in nature. *See Kramer*, Del. Supr., 546 A.2d 348 (claims involving stock options and termination agreements); *Parnes*, Del.Ch., C.A. No. 15192, 1998 WL 51739 (claims involving termination fees and bonuses to key executives); *Penn Mart Realty Co. v. Perelman*, Del.Ch., C.A. No. 8349, Hartnett, V.C., 1987 WL 10018 (Apr. 15, 1987) (claims involving golden parachutes and investment banker fees); *Bershad v. Hartz*, Del.Ch., C.A. No. 6960, Berger, V.C., 1987 WL 6092 (Jan. 29, 1987) (claims involving golden parachutes); *Rosen v. Navarre*, Del.Ch., C.A. No. 7098, Hartnett, V.C., 1985 WL 21155 (Oct. 29, 1985) (claims involving mismanagement and self-dealing). Similarly, claims arising from transactions which operate to deter

---

9. Additionally, paragraph 142 of the complaint contains an allegation that the defendant directors breached their fiduciary duties by "abandoning the negotiations regarding the Settlement Agreement to Well Fargo and First Bank and enhancing" their severance arrangements.

10. As to the first prong of *Tri–Star*, plaintiff Bradley argues, off-handedly, that Wells Fargo's interest as a First Interstate stockholder was affected to a lesser extent than the other shareholders, "because the acquisition of First Interstate was far more important to Wells Fargo that any concern over whether some of the consideration was diverted from it as a First Interstate shareholder." This is not the sort of disparate treatment or impact contemplated by *Tri–Star*. The alleged misconduct impacted the interests of Wells Fargo, as a stockholder of First Interstate, in the same way and to the same extent as all other stockholders, as a result of the alleged diminution in the value of First Interstate. Wells Fargo's interest in the accomplishment of the subsequent merger is irrelevant. In the circumstances, the first prong of *Tri–Star* is not satisfied.

or defeat offers to purchase the subject company's stock, i.e., entrenchment claims, are generally found to be derivative in nature. *See Lewis v. Spencer,* Del.Ch., C.A. No. 8651, Berger, V.C, 1989 WL 129529. (Oct. 31, 1989), *aff'd mem.,* Del. Supr., 577 A.2d 753 (1990). *See also BTZ, Inc. v. National Intergroup, Inc.,* Del.Ch., C.A. No. 11388, Hartnett, V.C., 1993 WL 133211 (Apr. 7, 1993) (claims involving adoption of golden parachutes for entrenchment purposes); *Cottle v. Standard Brands Paint Co.,* Del. Ch., C.A. Nos. 9342, 9405 & 9151, Berger, V.C., 1990 WL 34824 (Mar. 22, 1990) (claim of improperly adopted defensive tactics versus negotiating acquisition of company); *Sumers v. Beneficial Corp.,* Del.Ch., C.A. No. 8788, Hartnett, V.C., 1988 WL 23948 (Mar. 9, 1988) (claim alleging board arbitrarily rejected offers of potential acquirer at substantial premium); *Moran v. Household Int'l, Inc.,* Del. Ch., 490 A.2d 1059 (1985) (claim alleging improper adoption of poison pill as deterrence mechanism).

*Kramer* and *Parnes* are particularly instructive. *Kramer* involved the merger of Western Pacific Industries ("Western") into the Danaher Corporation. *See* Del Ch., C.A. No. 8675, Hartnett, V.C., 1987 WL 17043 (Sept. 11, 1987). The complaining shareholder alleged waste of corporate assets in connection with the proposed merger, specifically asserting that the directors had diverted funds to themselves "in the form of stock options and termination agreements and to third parties in the form of excessive fees and expense payments relating to the merger." Del. Supr., 546 A.2d at 349. In holding the shareholder's claims derivative, this Court stated:

" 'Mismanagement which depresses the value of stock is a wrong to the corporation, i.e., the stockholders collectively, to be enforced by a derivative action.' ... A claim that excessive fees, options and bonuses operated to depress the value of the stock of the corporation resulting in a loss in value of the stockholders is

merely a claim for the waste of corporate assets—a purely stockholder derivative claim."

Del.Ch., C.A. No. 8675, slip op. at 8, 1987 WL 17043. On appeal, the shareholder argued that the excessive fees and other alleged wrongs affected a special and direct injury to the shareholders' contractual rights that was distinct from any injury to the corporation. Del.Supr., 546 A.2d at 352. The Supreme Court rejected this argument, reasoning:

Suits against management for waste resulting from excessive payments of corporate funds (whether made to individual defendants or to third parties) do not affect contractual rights of shareholders associated with the ownership of common stock in the sense of altering the ratable distribution of a going private sale.

*Id.* at 353.

Plaintiff Bradley attempts to distinguish *Kramer* and to satisfy the second prong of *Tri-Star* by arguing that the transactions attacked in *Kramer* occurred months prior to the consummation of the merger, whereas, in this case, the allegedly improper transactions (or at least those challenged in Count II) occurred in connection with the directors' approval of the Wells Fargo merger agreement and, thus, it is argued, directly impacted the amount of consideration paid by Wells Fargo. To put it differently, the plaintiff contends that the facts of this case support a non-frivolous assertion of fact that the decisions taken to enter into the Settlement Agreement and to augment the First Interstate severance arrangements (in distinction from the actions taken in November 1995 when the First Bank merger was approved) directly impacted the amount of consideration Wells Fargo paid or was willing to pay in the merger.

*Parnes* rejected this same argument. *Parnes* involved a merger between Bally Entertainment Corporation ("Bally") and Hilton Hotels Corporation ("Hilton"). The plaintiff, a shareholder of Bally whose

shares were extinguished in the merger, brought suit alleging that Bally's board improperly approved excessive termination fees, compensation packages, warrants and stock to key officers of the corporation. These payments were conditioned on the effectiveness of the merger. The *Parnes* plaintiff tried to distinguish *Kramer* on the ground that the diversion of funds here occurred contemporaneously with the merger, not six months prior to it as in *Kramer. Parnes*, Del.Ch., C.A. No. 15192, slip op. at 4, 1998 WL 51739. This Court rejected this distinction, noting that the asserted claims were merely allegations of corporate waste which could only be maintained derivatively, as follows:

> Even if plaintiff's claim was not labeled with the "corporate waste" descriptor, plaintiff's alleged injury rests solely on allegations that some form of corporate mismanagement lowered the price at which plaintiff was able to sell her shares in a merger by transferring corporate assets from the corporation [to the CEO]. Such claims of shareholder injury have long been held to be derivative in nature.

*Id.* at 7, 1998 WL 51739.

▪ It is also my opinion that the well-pleaded allegations of fact in the complaint simply do not support the conclusory allegation that the amount Wells Fargo agreed to pay in the merger was affected by the negotiation or approval of the Settlement Agreement or the other provisions attending the approval of the Wells Fargo/First Interstate merger agreement. Most obviously, Wells Fargo's bid was already far higher than First Bank's, in part as a result of Wells Fargo's decision to raise the exchange ratio in its bid *after* the announcement of the First Bank/First Interstate merger agreement. With the winning bid, why would Wells Fargo agree to pay more? Similarly, Wells Fargo was forced by the fact of the existence of the break-up fee provisions in the First Bank merger agreement to make some allowance for them. Either it could negotiate

to settle them or it could choose to litigate over them. It could not, as the complaint suggests, ignore them, simply paying all or part of their probable value to the First Interstate stockholders. The complaint cannot ignore these realities merely by alleging that the extra costs associated with terminating one merger agreement and entering into another "directly" impacted the amount of consideration paid in the second. Only well-pleaded facts are operative in the context of a motion to dismiss. *See In re Tri–Star Pictures, Inc., Litig.*, Del.Supr., 634 A.2d at 326 (stating that conclusions "will not be accepted as true without specific allegations of fact to support them").

▪ Finally, plaintiff Bradley argues that the second prong of *Tri–Star* is satisfied because the wrongs alleged deprived the members of the putative class of a claimed "contractual" right to receive consideration for their shares "undiminished by and untainted by breaches of fiduciary duty." The Court is left to surmise that the undoubtedly "contractual" nature of the right to receive the consideration specified in the merger gives rise to a derivative "contractual" right to receive an additional amount of consideration "in the merger" from the defendant directors of First Interstate on account of their alleged breaches of fiduciary duty.

Plaintiff Bradley does not identify the source of this derivative or secondary "contractual" right other than by reference to cases recognizing the individual standing of plaintiffs directly attacking the "fairness" of a merger. Notably, plaintiff Bradley does not now and never has directly attacked the fairness of the Wells Fargo merger. The reason he has not done so is obvious. Wells Fargo prevailed in the active contest for control of First Interstate and did so by bidding higher than the competition.

In *Bershad*, this Court addressed a similar argument, holding:

It is true that a claim for breach of fiduciary duty can, in the merger context, give rise to a class claim. For it to do so, however, the alleged breach must go directly to the fairness of the merger, and plaintiff must be directly attacking the merger.

\* \* \* \* \* \*

Here, however, plaintiff conspicuously fails to attack the ... merger. [The acquirer] is not a party to this action; plaintiff did not seek injunctive relief prior to the merger; and there is no prayer for rescission or rescissory damages. The second cause of action is but a restatement of the waste claim alleged in the first cause of action.... The second cause of action is exactly the sort of derivative claim indirectly attacking the merger that was dismissed both in *Bokat v. Getty Oil Co.*, Del.Supr., 262 A.2d 246 (1970), and *Lewis v. Anderson, supra.*

Del.Ch., C.A. No. 6960, slip op. at 8–9, 1987 WL 6092.

Similarly, the complaint here fails to attack the merger and fails to name the acquirer, Wells Fargo, as a party to the action. There was no motion made to enjoin the merger and there is no claim for rescission or rescissory damages. Therefore, the rationale of *Bershad* requires dismissal of the complaint. *See also Kramer*, Del.Supr., 546 A.2d at 354 (holding claims of breach of fiduciary duty, diversion of funds and excessive payments insufficient to survive merger where complaint failed to challenge merger directly); *cf. Rabkin v. Philip A. Hunt Chemical Co.*, Del. Ch., 547 A.2d 963, 969 (1986) (individual claim stated where merger attacked directly).

*b. Count III. IV and V—Against First Bank for Aiding and Abetting the Breach of Fiduciary Duty and for Conspiring; Against All Defendants for Unjust Enrichment and for "Money Had and Received".*

The third count of the complaint is directed only at defendant First Bank. Generally speaking, it alleges that defendant First Bank aided and abetted and conspired with the other defendants in the breaches of fiduciary duties alleged in Counts I and II. Counts IV and V are directed at all defendants. They allege liability for unjust enrichment and liability for "money had and received" on account of the termination benefits paid to the defendant directors and the $200 million settlement paid to defendant First Bank.

All of these claims are also derivative in nature. Most easily addressed is Count III (against First Bank) and the allegations in Counts IV and V directed at the defendant directors. The claims in Count III for aiding and abetting the violations alleged in Counts I and II are necessarily subject to the same analysis as Counts I and II. If, as I have found to be the case, the claims of primary liability against the defendant directors belong to the corporation and could only be maintained by plaintiff Bradley in a derivative capacity, that finding logically applies with equal force to the alleged claims of secondary liability against defendant First Bank. Similarly, my conclusion that the claim for breach of fiduciary duty against the defendant directors belongs to the corporation, leads me to conclude that the other common law claims, based on the same conduct, also belong to the corporation and could only be prosecuted by plaintiff Bradley in a derivative capacity. Plaintiff Bradley's claim of injury is dependent upon his status as a stockholder of First Interstate and, for this reason, is simply too indirect to support a claim to recover in the place of the corporate entity which actually paid the sums involved.

A similar analysis leads me to conclude that Counts IV and V do not state a direct claim for relief by plaintiff Bradley or the class against defendant First Bank. These common law claims are predicated upon the course of contractual dealings between First Interstate and First Bank and, ultimately, upon the payment of monies by First Interstate to First Bank as part of the Settlement Agreement. Plain-

tiff Bradley asserts that he and the other members of the class were injured by these payments, indirectly, in their capacity as stockholders of First Interstate, because the payments decreased the value of First Interstate and, as the complaint speculates, the amount of consideration paid to First Interstate stockholders in the Wells Fargo merger.[11] The complaint does not allege that the claims asserted in Counts IV and V are based on any direct dealings between defendant First Bank and plaintiff Bradley or the class. Under the circumstances, I find that the claims alleged in those counts belong to First Interstate and could be prosecuted by plaintiff Bradley only derivatively, on behalf of that corporation.

■ Plaintiff Bradley argues that the claims in Counts IV and V against defendant First Bank are governed by both California and Delaware law, and that I should apply the law of California (which, plaintiff Bradley contends, recognizes his individual standing to prosecute the claims) because it imposes a higher standard of conduct. I disagree. There is nothing before me to suggest that California common law recognizes the right of

plaintiff Bradley or the other former stockholders of First Interstate to proceed directly against defendant First Bank to recover monies paid by First Interstate. On the contrary, the California case principally relied upon by plaintiff Bradley, *Gaillard v. Natomas Co.*, concerns the right of shareholders of California corporations to proceed *derivatively*, under a statute governing the affairs of California corporations. 173 Cal.App.3d 410, 219 Cal.Rptr. 74 (1985).

■ Finally, even if California law recognized the standing of a stockholder of a California corporation to proceed individually in the circumstances presented here (which does not appear to be the case), the internal affairs doctrine would require me to apply Delaware law to deny such standing to the stockholders of a Delaware corporation. That doctrine states that the management of the internal affairs of a corporation will be subject to the law of the state of incorporation.[12] *McDermott Inc. v. Lewis*, Del. Supr ., 531 A.2d 206, 215 (1987) (citing *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983)); *Draper v. Gardner*

---

11. I also note that any potential claim by First Interstate against defendant First Bank was released in the Settlement Agreement. The terms of that release are found in Appendix D (at D–15) of the First Interstate/Wells Fargo Joint Proxy Statement/Prospectus, which the parties agree is properly before the Court on this motion. *See* Transcript of Oral Argument, dated July 28, 1998, at 89 and 126. The pertinent language of the release states:

> "First Interstate Bancorp ("RELEASOR"), for valuable consideration, . . . releases and discharges First Bank System, Inc., . . . and their present and former directors, officers, stockholders, employees, agents, attorneys, successors and assigns (collectively, with First Bank System, Inc., "RELEASEES") from all actions, accounts, agreements, bonds, bills, causes of action, claims, covenants, contracts, controversies, damages, demands, debts, dues, extents, expenses, executions, judgments, liabilities, obligations, promises, predicate acts, reckonings, specialities, suits, sums of money, trespasses and variances whatsoever, in law, equity or

otherwise, known or unknown ("CLAIMS"), which against the RELEASEES or any of them, the RELEASOR, its successors, affiliates and assigns, or anyone claiming through or under any them, ever had or now has, or may hereafter have or acquire, based upon, related to, arising from, or connected in any way with any of the Agreement and Plan of Merger dated as of November 5, 1995 among First Bank System, Inc., Eleven Acquisition Corp., and First Interstate Bancorp, the related Termination Fee Agreements, Stock Option Agreements, . . . and other related agreements, the transactions contemplated thereby, . . . and the acquisition of First Interstate Bancorp by Wells Fargo & Company. . . ."

12. The internal affairs doctrine "governs the choice of law determinations involving matters *peculiar* to corporations, that is, those activities concerning the relationships *inter se* of the corporation, its directors, officers and shareholders." *McDermott*, Del.Supr., 531 A.2d at 215.

*Defined Plan Trust,* Del.Supr., 625 A.2d 859, 864–65 (1993). Here, plaintiff Bradley's argument that he individually has standing to sue defendant First Bank with regard to its contractual dealings with First Interstate, if accepted, would plainly and directly alter the allocation of responsibilities and power between the board of directors of First Interstate and its stockholders, by depriving the directors of the power to control (and to compromise) claims by First Interstate against First Bank. Thus, it would unavoidably touch upon the relationships *"inter se* of the corporation, its directors, officers and shareholders." *McDermott,* Del.Supr., 531 A.2d at 215.[13]

### c. Count VI—Against First Bank for Restitution and Disgorgement of Profits for Violation of California Business & Professions Code Section 17200 et seq.

Count VI of the complaint is brought against defendant First Bank and alleges that defendant First Bank's actions in connection with its merger agreement with First Interstate "prevented fair and honest competition for the purchase of the First Interstate common stock from plaintiff and the Class, and hampered the ability of the First Interstate shareholders to obtain the best and highest price for their First Interstate holdings," all allegedly in violation of the California Business & Profession Code § 17200 *et seq.* (known as the Unfair Competition Act, "UCA"). The complaint purports to seek "restitution and disgorgement" of defendants' "ill-gotten gains" to plaintiff and the class.

■ For the same reasons that I have found plaintiff Bradley's other claims to be derivative in nature, any claim to recover from defendant First Bank the monies paid to it by First Interstate would also be derivative. Count VI does not allege any special injury to plaintiff Bradley or the members of the class apart from that allegedly incurred by First Interstate or all former First Interstate stockholders, collectively.

■ Moreover, I conclude that Count VI does not state a claim under the UCA because neither plaintiff Bradley, nor the class he purports to represent, are members of the intended class of beneficiaries of the statute.[14] A plaintiff alleging a claim under the UCA must "be a member of the class for whose benefit the statute was enacted ." *Burt v. Danforth,* E.D. Mo., 742 F.Supp. 1043, 1053 (1990) (citing *Industrial Indem. Co. v. Santa Cruz County*

---

**13.** Plaintiff Bradley also argues that it would violate California's sovereignty to apply Delaware law "to govern the relationships between stockholders and third parties" in a situation in which there is substantial contact between California, the parties and the conduct at issue. This argument is wide of the mark. There is nothing before the Court to indicate that the California courts or Legislature have chosen affirmatively to confer standing on a plaintiff stockholder of a Delaware corporation to prosecute in an individual or class capacity a claim deemed to belong to the corporation under Delaware law.

**14.** Although I do not rest my decision on this point, it also does not appear that the relief plaintiff Bradley seeks—essentially the recovery of money damages—is available under this statute. Section 17203 of the UCA provides, as follows:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

CAL. BUS. & PROF. CODE § 17203 (West 1997).

This section allows only two possible types of relief—injunctive and restitutionary. *See Pena v. McArthur,* E.D. Cal., 889 F.Supp. 403, 407 (1994) ("A private litigant may plead a cause of action under the [UCA] only for injunctive or restitutionary relief."); *Bank of the W. v. Superior Ct.,* 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545, 552 (1992) (holding legal damages not available under Section 17203). Merely labeling a claim for money damages as "restitutionary" does not make it so.

*Super. Ct.*, 209 Cal.App.3d 1093, 257 Cal. Rptr., 655, 657 (1969)). The UCA is meant to protect customers and business competitors of wrongdoing parties. *Burt,* 742 F.Supp. at 1053 (citing *Perdue v. Crocker Nat'l Bank,* Cal.Supr., 38 Cal.3d 913, 216 Cal.Rptr. 345, 702 P.2d 503, 514 (1985) (en banc)). It does not include within its intended class of beneficiaries shareholders seeking to recover for injuries to their corporation. *Id.*

██ Plaintiff Bradley argues that a recent California Supreme Court case eliminated the requirement that a plaintiff be either a customer or a business competitor of the defendant to have standing to sue under the UCA. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,* 17 Cal.4th 553, 71 Cal.Rptr.2d 731, 950 P.2d 1086 (1998). In *Stop Youth,* the plaintiff, a public interest group, sued defendant grocery stores for unlawfully selling cigarettes to minors. Although not itself a customer or competitor of the defendant, the plaintiff was accorded standing to proceed ·on behalf of those actually suffering injury, the minor customers and those of defendant's competitors who refrained from selling to minors. *Stop Youth Addiction* does not support plaintiff Bradley's position because, unlike the situation in *Stop Youth Addiction,* neither he, nor the persons on whose behalf he purports to sue, are members of the protected class. Thus, as recognized in *Burt,* the claim he attempts to assert is simply not one permitted under the UCA.[15]

*2. Plaintiff Bradley's Standing to Maintain the Claims Asserted Was Extinguished by the First Interstate/Wells Fargo Merger.*

██ The Delaware Supreme Court has held that once a plaintiff "ceases to be a shareholder, whether by reason of a merger or for any other reason, [he] loses standing to continue a derivative suit." *Lewis v. Anderson,* Del.Supr., 477 A.2d 1040, 1049 (1984); 8 *Del. C.* § 327 (derivative stockholder must be a stockholder at the time of the alleged wrong as well as throughout the course of the litigation). *Accord Kramer,* Del.Supr., 546 A.2d at 354; *Bershad,* Del.Ch., slip op. at 5, 1987 WL 6092; *Penn Mart Realty,* Del. Ch., slip op. at 5–6, 1987 WL 10018; *Rosen,* Del.Ch., slip op. at 3, 1985 WL 21155. There are two exceptions to this rule; first, when the merger is "perpetrated merely to deprive shareholders of the standing to bring a derivative action," or second, where the merger "is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise". *See Kramer,* Del.Supr., 546 A.2d at 354.

██ Plaintiff Bradley argues, incorrectly, that the second exception applies. In *Schreiber v. Carney,* Del.Ch., 447 A.2d 17 (1982), this Court held that the plaintiff did not lose standing as a result of a merger in which "there was *no meaningful effect* on the plaintiff's ownership of the business enterprise." *Schreiber,* Del.Ch., 447 A.2d at 22. In reaching its decision, this Court noted that the exception would not apply to "mergers with outside or pre-existing corporations with substantial assets," *id.,* the situation present here. *See also Bonime v. Biaggini,* Del.Ch., C .A. Nos. 6925 & 6980, Walsh, V.C., slip op. at 7, 1984 WL 19830 (Dec. 7, 1984) (exception not applicable where merger resulted in a "corporate mix [ ] distinctly different from that [of the prior corporation]").

**15.** California case law also bars plaintiff Bradley from using the UCA to "plead around" the law of another state that bars the claim. *See Manufacturers Life Ins. Co. v. Superior Ct.,* 10 Cal.4th 257, 41 Cal.Rptr.2d 220, 895 P.2d 56, 71 (1995); *Rubin v. Green,* 4 Cal.4th 1187, 17 Cal.Rptr.2d 828, 847 P.2d 1044, 1053 (1993). In this case, Delaware law prescribes that all of plaintiff Bradley's claims against defendant First Bank belong to First Interstate and can only be maintained by a stockholder suing in a derivative capacity. Plaintiff Bradley cannot employ the UCA to evade this requirement of Delaware law, whether it arises out of the decisional law of this State or one of its statutes. *See Manufacturers Life,* Cal.Supr., 895 P.2d at 71.

In the alternative, plaintiff Bradley contends that his ownership of pre-merger First Interstate and post-merger Wells Fargo common stock meet the *Lewis* requirement of continuous ownership, since any claims belonging to First Interstate passed to Wells Fargo at the consummation of the merger, and plaintiff Bradley can now assert those claims derivatively as a stockholder of Wells Fargo.[16] But Bradley has never purported to satisfy the demand requirements for a derivative suit on behalf of Wells Fargo. *See Sumers*, Del.Ch., C.A. No. 8788, slip op. at 5, 1988 WL 23948 ("This suit is really a stockholder derivative action and plaintiff therefore was required to make a pre-suit demand for relief on the board pursuant to Chancery Rule 23.1 or show that a pre-suit demand would have been futile. Plaintiff, however, has not even attempted to show that the demand would have been futile.")

Finally, plaintiff Bradley asks the Court to follow the Third Circuit's ruling in *Blasband v. Rales*, 3d Cir., 971 F.2d 1034 (1992) (purporting to apply Delaware law), and a case finding post-merger standing under California law.[17] I decline to do so, as the teaching of the Delaware Supreme Court in *Lewis v. Anderson* is both clear and controlling of my decision.[18]

## IV. CONCLUSION

For all of the foregoing reasons, I find all of the claims alleged in the April Amended Complaint to be derivative in nature and that plaintiff Bradley's standing to maintain those claims was extinguished by the accomplishment of the merger between First Interstate and Wells Fargo. Accordingly, the defendants'

motions to dismiss are granted. IT IS SO ORDERED.

---

**16.** Upon the effective date of a merger or consolidation, all assets of the merged corporation, including any causes of action that may exist on its behalf, pass to the surviving corporation by operation of law. 8 Del. C. § 259(a). *See also Heit v. Tenneco, Inc.*, D. Del., 319 F.Supp. 884 (1970).

**17.** *Gaillard v. Natomas Co.*, 173 Cal.App.3d at 414–19, 219 Cal.Rptr. 74.

**18.** The Third Circuit's decision in *Blasband* is both inconsistent with the clear holding of *Lewis v. Anderson* and immaterial to the decision in this case as, at most, it would recognize plaintiff Bradley's ability to proceed double derivatively in the name of Wells Fargo, something which plaintiff Bradley does not purport to do. *Blasband*, 971 F.2d at 1040–46.