# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KELLY BARBEY and THE BERMUDA HESED FOUNDATION, a Bermuda Trust, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2022-0107-PAF |
| CEREGO, INC., a Delaware corporation, | ) ) ) | |
| Defendant, | ) ) | |
| v. | ) ) ) | |
| KENNETH YOUNG, | ) ) | |
| Intervenor. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: June 14, 2023
Date Decided: September 29, 2023

Neil R. Lapinski, Phillip A. Giordano, Madeline R. Silverman, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; *Attorneys for Plaintiffs Kelly Barbey and The Bermuda Hesed Foundation*.

Kenneth H. Young, Intervenor, *pro se*.

**FIORAVANTI, Vice Chancellor**

Kellogg "Kelly" Barbey and The Bermuda Hesed Foundation ("BHF") (together, "Plaintiffs") brought this 8 *Del. C.* § 225 action to determine the proper constitution of the board of directors of Cerego, Inc. ("Cerego" or the "Company"), a Delaware corporation.[1]  This action is one of two suits in this court effectively seeking to nullify a corporate inversion, whereby Cerego became a subsidiary of its wholly owned subsidiary, Cerego Japan, Inc. ("CJ"), a Japanese entity.[2]

The "Inversion" was effected through a tender offer to the Cerego stockholders, whereby CJ offered to swap shares of CJ in exchange for the outstanding shares of Cerego (the "Tender Offer").  The Inversion purportedly gave CJ a supermajority of Cerego's outstanding shares, with which CJ removed the existing directors, including Barbey, and replacing them with Michiko Ando.

Plaintiffs challenge Barbey's removal, contending that the inversion was invalid.  Specifically, Plaintiffs argue that Cerego purported to authorize CJ, Cerego's then wholly owned subsidiary, to commence the tender offer at a

---

[1] Citations to the docket in this action will be in the form "Dkt. #."  Citations to trial exhibits will be in the form "JX #."  Citations to the trial transcript will be in the form "Tr. # (X)," with X representing the speaker.  After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr."  No disrespect is intended.

[2] "An 'inversion transaction' is an arrangement that wholly or partly inverts or reverses the positions of related corporations.  In an inversion transaction, stock of a corporation ("P" [here, Cerego]) typically is transferred by one or more P shareholders to a wholly or partly owned subsidiary of P ("S" [here, CJ]) in exchange for newly issued S shares."  2 Martin D. Ginsburg & Jack S. Levin, *Mergers, Acquisitions, and Buyouts*, ¶ 908 (2011).

September 17, 2021 special meeting of the Cerego board (the "Meeting"), to which Barbey was not provided adequate notice as required under the Cerego bylaws (the "Bylaws"). Because Barbey was not provided adequate notice of that meeting, Plaintiffs claim that all actions taken at the Meeting were void. Therefore, according to the Plaintiffs, CJ's purported removal of the Cerego board was invalid, because it never became Cerego's majority stockholder.

The intervenor in this action is Kenneth Young ("Intervenor"), one of the other directors purportedly removed by CJ after the inversion. Young is defending the validity of his and Barbey's removal as directors.

Intervenor contends that the Meeting was a regular meeting for which notice was not required, or alternatively, that notice did occur. Intervenor also argues that Cerego's authorization was not required for CJ to launch the Tender Offer, and that Plaintiffs have not carried their burden of proof with respect to the legal results of the conduct Plaintiffs allege.

As a factual matter, the court finds that the Meeting was a special meeting, and that Barbey was not provided with notice of the Meeting as required under Cerego's Bylaws. Accordingly, the court finds that, for the purposes of determining the proper constitution of the Cerego board (the "Board") in this Section 225 action, the Meeting and all actions taken at it are void. Despite that finding, however, the court concludes that the Plaintiffs have not satisfied their burden to invalidate

2

Barbey's removal as a director because they have not demonstrated that Cerego board action was required to authorize CJ's tender offer that resulted in its becoming Cerego's majority stockholder. Therefore, the court finds that CJ's removal of the board is effective, and that Ando is Cerego's sole director.

## I.    BACKGROUND

What follows is the court's findings of fact following trial.

**The Parties**

Plaintiff BHF, a Bermuda trust, is a charitable foundation which allocates its funds according to various "statutes of the foundation."[3] BHF became a stockholder of Cerego in June of 2016.[4]

Plaintiff Barbey is a member of BHF's advisory council and is an investment advisor to BHF.[5] Barbey joined the Board on or around May 30, 2019.[6]

Defendant Cerego is a Delaware corporation that develops education software.[7]

---

[3] Tr. 5:4–7 (Barbey).

[4] *Id.* at 4:21–24 (Barbey).

[5] *Id.* at 5:3–7 (Barbey).

[6] *Id.* at 5:12 (Barbey).

[7] JX 2; JX 21 at I0000335.

Non-party CJ is a Japanese Kabushiki Kaisha headquartered in Shibuya–ku, Tokyo, Japan.[8]  Prior to the Inversion, CJ was a wholly owned subsidiary of Cerego.

Intervenor Kenneth Young was a member of the Board at all relevant times. Although initially represented by counsel, Intervenor has proceeded *pro se* since September 26, 2022.[9]

Non-party Eric Young was a member of the Board and the Company's CEO until his purported removal in December 2021.  He is also the Representative Director, the equivalent of the CEO, of CJ.[10]  He is also the brother of Intervenor Kenneth Young.[11]

Ando is the purported sole director and CEO of Cerego.[12]

**Factual Background**

Since at least late 2019 until early September 2021, the Board consisted of Barbey, Eric Young, Intervenor, Andrew Smith Lewis, Joseph Keating, George Mimura, Emmanuel Kampouris, and Paul Mumma.[13]  Until sometime in or around June 2020, Cerego held roughly quarterly Board meetings, and Barbey made a

---

[8] Though indicated in English as "Cerego Japan, Inc.," CJ's true name is Cerego Japan Kabushiki Kaisha.  Dkt. 1 at Ex. G.

[9] Dkt. 34.

[10] JX 21 at I0000337.

[11] Tr. 6:18–7:2 (Barbey).

[12] JX 24.

[13] JX 3 at I0000878.

regular practice of attending them.[14] "Intense" "informal discussions" occurred more frequently than regular meetings, and often covered and disposed of Board-level decisions.[15] Formal meetings and some informal discussions were noticed via email by the CEO and took place over Zoom.[16]

Sometime in or around June 2020, Barbey raised "red flags from [his] experience on the board" and, immediately afterwards, formal meetings faded away.[17] Communications that surfaced over the course of this litigation indicate intentional exclusion of Barbey from key decisions about Cerego.[18]

The first time the Board appears to have discussed the Inversion was at a July 1, 2021 huddle.[19] Emails between some of the Board members in August and

---

[14] Tr. 5:13–15, 6:2–5 (Barbey). The record includes minutes from regular Board meetings on November 6, 2019, November 20, 2019, and May 11, 2020. JX 3; JX 28.

[15] Tr. 5:16–21 (Barbey). The record reflects "huddles" through email and on Zoom on January 29, 2021, March 19, 2021, April 23, 2021, May 6, 2021, and July 1, 2021, and further indicates that Board-level decisions were being discussed over email throughout 2021. JX 4; JX 5; JX 6; JX 7; JX 9; JX 9; JX 10.

[16] Tr. 5:22–7:7 (Barbey).

[17] Id. at 7:8–17 (Barbey).

[18] JX 9 at I0000849 (listing huddle agenda point: "Discuss when and how to inform KB, as it's likely coming soon, and probably will be forced when we go through the bridge loan procedure" in a June 29, 2021 email); JX 10 at I0000319 (stating, in an August 15, 2021 email, "I'd like to have your thoughts, especially in light of KB likely making a fuss."); Tr. 89:17–18 (Kenneth Young) (Q: "Who is KB?" A: "I think that would be Mr. Barbey."). None of the huddle-related emails in late 2020 or throughout 2021 were directed to Barbey. See JX 4; JX 5; JX 6; JX 7; JX 9; JX 9; JX 10.

[19] JX 9 (listing the Inversion as a discussion point for this huddle). Intervenor testified at trial that he could not recall if that was the first time the Board ever discussed the Inversion. Tr. 89:13–14 (Kenneth Young).

5

September of 2021 discussed the Inversion and a related true-up process whereby some of the Board members would receive 6.25% of CJ.[20] Excel spreadsheets attached to their emails outlined the terms, reasoning, and steps for both processes.[21] Throughout the iterations of the spreadsheet, "Step #2" consistently identified the need to bring the transactions to a "Full Board Meeting."[22] The last such spreadsheet produced in this litigation omitted its predecessors' explicit note that such a meeting needed to include Barbey.[23]

On September 15, 2021, Lewis resigned from the Board.[24]

On September 16, 2021, at 8:24 PM, Eric Young circulated an invitation for a September 17, 2021 Board meeting, which together with the accompanying Zoom invitation at 8:50 PM, the parties have so hotly disputed in this case (collectively the "Emails").[25] The invitation states in whole:

> Dear Board members, I would like to call our inaugural Board of Directors meeting for Cerego, Inc for Year 2021. Time is from this

---

[20] JX 10.

[21] *Id.*

[22] *Id.* at I0000320:003, I0000871:003, I0000899:003, I0000919:003.

[23] *Compare id.* at I0000320:003, I0000871:003, I0000899:003 (noting that the transactions would need to be approved at a meeting of the "Full Board (including KB/PM/ASL [Barbey, Mumma, and Lewis, the three directors excluded from the email discussion of the transactions])"); Tr. 97:11–14 (Kenneth Young) (Q: "Now, PM, is that Paul Mumma?" A: "Yes." Q: "And ASL is Andrew Smith Lewis?" A: "Correct.") *with* JX 10 at I0000919:003 (not noting specific Board members who needed to be present).

[24] JX 19 at I0000002.

[25] JX 13; JX 14.

Friday at 9pm, NYC time, Sept 17. The agenda items are: 1) ratification of the Compensation Committee's recent analyses and decisions. 2) Authorization of Cerego Japan to take all necessary steps and undertakings to raise capital from internal and external sources towards pursuing the economic interests of Cerego Japan and Cerego, Inc. I look forward to our discussion. I will send meeting coordinates separately.[26]

Eric Young blind copied the recipients of the Emails. None of the versions of the Emails produced in this litigation revealed the recipients.[27] Intervenor did, however, produce screenshots from Eric Young's mobile device that purport to be digital images of the Emails (the "Screenshots").[28] The Screenshots indicate that Eric Young sent the Emails to the entire Board, including Barbey.[29] Intervenor did not produce the Emails in native format.[30] At trial, Intervenor stated that Eric Young, the Emails' custodian, did not produce the Emails in native format because "the Cerego Japan board of directors believed that he was conflicted in this case."[31]

---

[26] JX 13.

[27] JX 11; JX 13; JX 14.

[28] JX 12; JX 15.

[29] *Id.* The Screenshots indicate that all recipients were bcc-ed.

[30] Tr. 118:13–121:1 (Kenneth Young).

[31] *Id.* at 119:19–20 (Kenneth Young).

Intervenor did not articulate a reason Eric Young could produce a screenshot but not a native file. The Screenshots do not contain the Emails' metadata.[32]

Keating resigned from the Board several hours before the Meeting.[33]

On September 17, 2021, the Board held the Meeting.[34] Eric Young, Intervenor, Mimura, and Kampouris attended the Meeting; Barbey was not present.[35] The Meeting began at 9:00 PM.[36] Eric Young requested "[a]uthorization to enable Cerego Japan to take all necessary steps to raise capital from internal and external sources towards pursuing the economic interests of Cerego Japan and Cerego Inc."[37] The Board members in attendance unanimously approved this item, and empowered Cerego's executives to take actions to affect the intended results.[38] The minutes

---

[32] A file's metadata provides information about the file itself. Individual pieces of metadata can be helpful by demonstrating who created a file, the last person to edit it, and when edits occurred, among other things. Altogether, metadata can be used to confirm the authenticity of a file. Screenshots of an email, however, do not preserve the email's metadata.

[33] JX 19.

[34] JX 17 at I0000221.

[35] *Id.* While it is uncontested that Mumma was not a member of the Board by this time, the record does not demonstrate precisely when Mumma resigned from the Board. The last reference to his Board membership in the record is a line in a spreadsheet attached to a September 1, 2021 email noting that Mumma would need to be included in a full Board meeting to vote on the Inversion. JX 10 at I0000893:003. Intervenor did not produce Mumma's resignation in discovery but testified that Mumma resigned in September of 2021. *See* Tr. 74:6–76:23 (Kenneth Young).

[36] JX 17 at I0000221.

[37] *Id.*

[38] *Id.*

document that the Meeting concluded at 9:15 PM.[39]  Eric Young circulated the minutes to all of the directors other than Barbey at 9:07 PM, all of whom returned a signed version by 9:14 PM.[40]

Mimura and Kampouris submitted their resignations from the Board shortly after the meeting.[41]  Following these resignations, the Board consisted only of Eric Young, Intervenor, and Barbey.

On September 26, 2021, Eric Young blind copied Intervenor on an email to himself that discussed edits to an attached information statement (the "Information Statement") intended to inform Cerego stockholders about the Inversion.[42]

On October 8, 2021, Eric Young sent two emails to Cerego's stockholders.[43] The first email provided a high-level overview of the Inversion and extolled its legal benefits, and was the latest of several emails on a chain of communications from Eric Young to Cerego's stockholders in his capacity as CEO.[44]  The email directly indicated that "[Cerego] has authorized, and I … along with a number of [Cerego]'s other large shareholders, believe it is now in our individual and collective interests

---

[39] *Id.*

[40] JX 17.

[41] JX 19.

[42] JX 20.

[43] JX 21; JX 22.

[44] JX 21.

to [tender]."[45]  Eric Young expressed that "we hope you will elect" to participate, and said that he would exchange his own shares if a majority of Cerego's stockholders tendered.[46]  The second email included the finalized Information Statement.[47]

These and subsequent emails directed at stockholders were not sent directly to Barbey.  Instead, Barbey received them from Marco Bernasconi, a BHF trustee who received the stockholder communications directed at BHF and forwarded them to Barbey.[48]

On August 10, 2021, Barbey submitted a written demand letter seeking to inspect certain books and records in his capacity as a director of Cerego.[49]  On October 13, 2021, Barbey filed a verified complaint under 8 *Del. C.* § 220(d) to compel inspection (the "220 Action").[50]

Five days after filing the 220 Action, Barbey and BHF filed a fiduciary duty action against the Board, alleging, among other things, that the Board breached their

---

[45] *Id.* at I0000336.

[46] *Id.* at I0000337.

[47] JX 22.

[48] Tr. 29:14–33:12 (Barbey).

[49] *See Barbey v. Cerego, Inc.*, C.A. No. 2021-0884-PAF (Del. Ch.), Dkt. 1.

[50] *Id.*  On April 13, 2022, the court entered a default judgment in favor of Barbey in the 220 Action and ordered Cerego to pay Barbey's reasonable attorneys' fees and expenses. *Id.* at Dkt. 23.

fiduciary duties of loyalty by engaging in the Inversion (the "Plenary Action").[51] Plaintiffs sought expedited proceedings and a temporary restraining order enjoining the transaction.[52]

On October 21, 2021, the court heard oral argument on Barbey's motions in the Plenary Action. The court denied both motions because the exchange offer had been substantively completed, and there was nothing for the court to enjoin.[53] In denying Barbey's motions, the court "certainly [was] not passing on the merits of the claims."[54]

On December 23, 2021, Eric Young sent another email to Cerego's stockholders.[55] First, the email reported that, after the Inversion, CJ was a supermajority stockholder of Cerego.[56] Second, it indicated CJ had used its control to remove Eric Young, Intervenor, and Barbey from the Board, replacing them with Ando.[57] Third, it indicated that Ando had also replaced Eric Young as CEO.[58] Ando

---

[51] *Barbey v. Young,* 2021-0900-PAF (Del. Ch.), Dkt. 1.

[52] *Id.*

[53] *Id.* at Dkt. 13; *id.* at Dkt. 17 at 29:14–30:16.

[54] *Id.* at 33:10–14. There has been no docket activity in the Plenary Action since February 2022.

[55] JX 24.

[56] *Id.*

[57] *Id.*

[58] *Id.*

emailed Cerego's stockholders on December 30, 2021, introducing herself and indicating a potential for dissolution of the Company.[59]

After learning about the Meeting, Barbey engaged Kroll Associates, Inc. ("Kroll"), an global advisory firm that provides forensic investigation services, to determine if Barbey had, in fact, received Eric Young's invitation to the Meeting.[60] Barbey provided Kroll with the login credentials to his email address on January 18, 2022, to conduct a forensic search, and, on January 21, 2022, received a report confirming that the Emails were not present in that account.[61] Barbey credibly testified at trial that this was the account at which he would have been emailed if such an email had been sent, and Kroll reported similar findings with respect to a second account on August 2, 2022.[62]

At trial, Plaintiffs offered the testimony of Donald Justice Price, an associate managing director at Kroll, to describe the substance and results of Kroll's investigation. Price was not directly involved in the initial review of Barbey's email accounts or preparing the Kroll reports.[63] Nor was he tendered as an expert witness.

---

[59] JX 25 at Plaintiff012241.

[60] JX 16.

[61] *Id.*; Tr. 38:1–7 (Barbey).

[62] Tr. 6:9–11 (Barbey); JX 16.

[63] Tr. 58:6–12 (Price). The person who conducted the initial review was no longer associated with Kroll as of the time of trial. *Id.* at 58:13–22 (Price).

Rather, Price became involved just ten days before trial and reviewed the reports and performed his own forensic search of Kroll's preserved data from the email accounts to confirm the findings in the reports.[64]

The evidence from Kroll's investigation does not conclusively establish that Barbey did not receive the Emails.[65] As Price acknowledged, Kroll did not review Barbey's email account until four and eleven months respectively after the date of Eric Young's email purporting to notice the Meeting. Price agreed that email accounts keep automatically and manually deleted files for periods determined by the account's retention policy.[66] The record is incomplete as to the retention policies of either of Barbey's email accounts. As Price conceded, it is possible that the Emails were deleted and the retention period passed before Kroll's forensic searches, and therefore would have been undiscoverable.[67]

On January 31, 2022, Plaintiffs brought this action to determine the proper constitution of the Board.[68] Plaintiffs filed a motion for a rule to show cause why a default judgment should not be entered against Cerego for failing to file an answer or any responsive pleading to the complaint within the time frame required by Court

---

[64] *Id.* at 49:14–23 (Price).

[65] *See generally id.* at 41:21–69:2 (Price).

[66] *Id.* at 61:14–62:6 (Price).

[67] *Id.*

[68] Dkt. 1.

of Chancery Rules 6 and 12.[69]  On March 15, 2022, Kenneth Young moved to intervene in this action on the basis that Cerego had defaulted and therefore, if Intervenor were not allowed to intervene, he risked default judgment personally affecting him by reinstating him on the Board against his wishes.[70]  The court granted Intervenor's motion and the case proceeded with discovery.[71]

On September 26, 2022, the court granted a motion permitting Intervenor's counsel to withdraw.[72]  Intervenor has since proceeded *pro se*.

The court held a half-day trial in this action via Zoom on November 29, 2022.[73]  There were 28 trial exhibits.  There were three fact witnesses:  Barbey, Intervenor, and Price.

The parties subsequently filed proposed findings of fact and conclusions of law and then responded to their opponents' proposed findings and conclusions.[74] Thereafter, the court held post-trial argument.[75]  On June 22, 2023, Plaintiffs'

---

[69] Dkt. 6.

[70] Dkt. 7.

[71] Dkt. 12 at 30:20–32:1.

[72] Dkt. 35.

[73] Dkt. 54.

[74] Dkts. 60, 61, 63, 64.

[75] Dkt. 71.

counsel submitted a post-argument letter, attaching two sections of the Japanese Companies Act.[76]

## II. ANALYSIS

Under Section 225 of the Delaware General Corporation Law ("DGCL"), "[u]pon application of any stockholder or director . . . the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation . . . ." 8 *Del. C.* § 225(a). Section 225 actions are "in the nature of an *in rem* proceeding," only exert jurisdiction only over the corporation, and may only provide relief concerning the corporate office. *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *4 (Del. Ch. Sept. 17, 1997); *see Genger v. TR Invs., LLC*, 26 A.3d 180, 199–200 (Del. 2011). In a Section 225 proceeding, the court may adjudicate claims that are necessary to determining the proper holder of a corporate office, but the court may only order relief concerning the corporate office. *Genger*, 26 A.3d at 200. All other types of ultimate relief may only be obtained through a plenary action through which the court exercises jurisdiction over the affected parties. *Id.*

The party challenging a director's removal bears the burden of proving by a preponderance of the evidence that the director's removal was invalid. *See Unanue v. Unanue*, 2004 WL 2521292, at *10 (Del. Ch. Nov. 9, 2004) (holding that "the

---

[76] Dkt. 70.

burden of proving that a director's removal is invalid rests with the party challenging its validity" and refusing to shift that burden when the party requesting the burden-shift "failed to present any valid reason why the evidentiary burden should be shifted"). "[T]he plaintiff in the 225 Action, bears the burden of proving by a preponderance of the evidence that it is entitled to relief." *In re IAC/InterActive Corp.*, 948 A.2d 471, 493 (Del. Ch. 2008)).

### A. Plaintiffs Established that the Meeting was Special, Not Properly Noticed, and Therefore Invalid.

Plaintiffs challenge Barbey's removal on the grounds that CJ never had authority from Cerego to commence the Tender Offer that purported to make it Cerego's majority stockholder with the power to replace the Board. Plaintiffs' sole focus is on the validity of the September 17, 2021 Meeting, at which the Board approved the Tender Offer. Plaintiffs argue that the Meeting was a special meeting that required notice under the Bylaws, and that the Meeting was improperly noticed because Barbey never received the Emails. As a result, Plaintiffs contend that the Meeting and everything approved at that meeting is void. Intervenor, on the other hand, insists that the Meeting was a regular meeting, not requiring notice. In the event the court holds that the Meeting was a special meeting, Intervenor argues that Eric Young did send advance notice of the Meeting to Barbey.

16

### 1. The Meeting was a special meeting.

The court construes a corporation's certificate and bylaws using traditional principles of contract construction. *Matulich v. Aegis Commc'ns Grp., Inc.*, 942 A.2d 596, 600 (Del. 2008) ("The rules of construction which are used to interpret contracts and other written instruments are applicable when construing corporate charters and certificates of designation."). "Contract interpretation starts with the terms of the contract. If the terms are plain on their face, then the analysis stops there." *Sanders v. Wang*, 1999 WL 1044880, at *6 (Del. Ch. Nov. 8, 1999). The court only inquires further if the contract's terms are "reasonably subject to more than one interpretation" and, therefore, ambiguous. *Supermex Trading Co., Ltd. v. Strategic Sols. Grp., Inc.*, 1998 WL 229530, at *2 (Del. Ch. May 1, 1998).

The Bylaws provide for two types of Board meetings. Section 3.6 pertains to regular meetings and states, in its entirety: "Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the board."[77] Section 3.7 of the Bylaws provides for special meetings "at any time" but requires notice.[78] By the construction of these terms, if a meeting is not a regular meeting, it is a special meeting.

---

[77] JX 1 at 6.

[78] *Id.* at 7.

17

Here, the terms of the Bylaws are unambiguous, and as applied to the facts, it is clear that the Meeting was special. Section 3.6 states that regular meetings may be held "at such time and place . . . as shall be determined *by the board*."[79] This language indicates that the Board must determine the time and place at which a regular meeting is to be held. There is no evidence in the record that the Board acted to set the time and place of the Meeting, or that the Board ever adopted a standing rule or schedule setting a time and place at which regular meetings would be held. Barbey credibly testified that the Board stopped holding periodic meetings altogether in or around June 2020.[80] The Board's general lack of scheduled meetings, the absence of Board action setting meetings, and the fact that no meetings had occurred for over a year indicate that the Meeting was not regular. That Eric Young's email dubs the Meeting the Board's "inaugural Board of Directors meeting . . . for Year 2021"[81] does not transform it into a regular meeting. To the contrary, Eric Young's statement in the same sentence that "I would like to call [this] meeting" indicates he called the Meeting on his own.[82] The Meeting was not a regular meeting. Therefore, the Meeting was the only other type of meeting provided for in the Bylaws: a special meeting requiring notice.

---

[79] *Id.* at 6 (emphasis added).

[80] Tr. 7:8–17 (Barbey).

[81] JX 13.

[82] *Id.*

## 2. Barbey was not provided proper notice of the Meeting.

A corporation's bylaws govern its notice requirements. *See Bruch v. Nat'l Guar. Credit Corp.*, 116 A. 738, 740 (Del. Ch. 1922). Section 3.7 of the Bylaws, "Special Meetings; Notice," states, in pertinent part:

> Notice of the time and place of special meetings *shall be delivered* personally or by telephone *to each director* or sent by first-class mail, facsimile, electronic transmission, or telegram . . . . If the notice is delivered personally or by facsimile, electronic transmission, telephone or telegram, it shall be delivered at least 24 hours before the time of the holding of the meeting.[83]

As a member of the Board, Barbey was entitled to notice of the Meeting in accordance with Section 3.7.

The parties hotly contest whether Barbey received the required notice. Plaintiffs contend that Barbey never received the Emails and he testified as much at trial.[84] Plaintiffs also proffer the two reports by Kroll, which indicate that the Emails were not in Barbey's email accounts when Kroll conducted the searches.[85] As noted above, these reports are not conclusive evidence because emails deleted outside of the accounts' unknown retention periods would not have been discoverable, even in such forensic searches. Intervenor contends that Barbey did receive notice and, to

---

[83] JX 1 at 7 (emphasis added).

[84] Tr. 11:9–15; 22:6–14 (Barbey).

[85] JX 16.

19

support this contention, proffers the Screenshots, which purport to show that Barbey was blind copied on the Emails.[86]

Plaintiffs' proffered evidence is compelling. Though the Kroll reports are not conclusive, they are persuasive evidence for the proposition Plaintiffs seek to establish. Furthermore, Barbey's trial testimony is consistent with those reports.

Intervenor's production hurts, rather than helps, his case. "[T]he production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse." *Smith v. Van Gorkom*, 488 A.2d 858, 878 (Del. 1985). The Screenshots do not include any metadata from the Emails, and therefore are weak evidence. The Emails in their native format would contain metadata verifying their authenticity, and therefore would be strong evidence. Strong evidence, the Emails in their a native format from his brother, should have been available to Intervenor.[87]

Intervenor produced weak evidence – the Screenshots – when strong evidence – the Emails in native format – was, or should have been, available. Had Intervenor produced the Emails in native format, Plaintiffs' forensic analysts could have easily determined when Eric Young sent the email, to whom it was sent, and if the file had

---

[86] JX 12; JX 15.

[87] The court is not convinced that Eric Young's unarticulated "conflict" was what prevented the production of the Emails in native format.

been modified at any point. Production of an email giving notice to Barbey in its native format likely would have resolved this case, yet Intervenor produced no such email. Therefore, failure to produce the Emails in their native format "can only lead to the conclusion" that they would have been adverse to Intervenor's case. *Van Gorkom*, 488 A.2d at 878. Based on the Kroll reports, Barbey's consistent trial testimony, and the adverse inference resulting from Intervenor's weak evidentiary production, the court finds that Barbey did not receive notice of the Meeting as required by the Bylaws.

### 3. The Meeting is void.

"It is, of course, fundamental that a special meeting held without due notice to all the directors is not lawful, and all acts done at such meeting are void." *Lippman v. Kehoe Stenograph Co.*, 95 A. 895 (Del. Ch. 1915); *see also Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1998 WL 71836, at *7 (Del. Ch. Feb. 4, 1998) ("Delaware law is well settled that board action taken in the absence of a director . . . where notice of a special meeting was not given to a director [] is void."). The court finds that the legal result of the Board's failure to provide Barbey with notice is that the Meeting and all acts done at it are void. The court does so, however, solely for the purpose of determining the composition of the Cerego Board. *See Genger*, 26 A.3d at 200 ("The Court of Chancery may adjudicate [a plenary] claim in a Section 225 proceeding, but only for the limited purpose of determining the

21

corporation's de jure directors and officers."); *Marks v. Menoutis*, 1992 WL 22248, at *5 (Del. Ch. Feb. 3, 1992) ("This Court cannot directly order a transaction to be rescinded in a § 225 proceeding.").

**B.     Plaintiffs Did Not Provide Legal Arguments Connecting the Invalidity of the Meeting to Barbey's Removal.**

To prevail in this Section 225 action, however, the Plaintiffs must do more than merely show that the actions taken at the Meeting were invalid.  Plaintiffs must connect the Board's decisions at the Meeting to CJ's ultimate removal of Barbey from the Board.  In other words, Plaintiffs bear the burden of proving that the decisions taken by the Board at the Meeting were necessary to CJ's becoming Cerego's majority stockholder.  Plaintiffs argue that the direct effect of voiding the Meeting is the failure of the Tender Offer, collapse of the Inversion, and resulting invalidation of CJ's vote removing Barbey (the "Vote").[88]  Intervenor contends that the Meeting was not necessary for the Tender Offer or Inversion, and that

---

[88] Plaintiffs' challenge to Barbey's removal is based solely upon the validity of the actions taken at the September 17, 2021 Cerego Board Meeting.  The only issue of fact that Plaintiffs listed in the pre-trial stipulation was "[w]hether Eric Young ever emailed or otherwise sent Kelly Barbey notice of the September 17, 2021 board meeting."  Dkt. 52 at 3.  The only issues of law that Plaintiffs listed were "[w]hether the September 17, 2021 Cerego board meeting was properly noticed and convened pursuant to Cerego's bylaws and the DGCL" and "[w]hether the Boards [sic] authorization of Eric Young and the actions taken thereafter by the Cerego Japan are void."  *Id.* at 4.  Plaintiffs thus concede that if the Tender Offer was not invalid, CJ had the authority, as Cerego's controlling stockholder, to remove Barbey as a director.  "Issues not briefed are deemed waived." *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

22

invalidating the Meeting has no legal effect on the Vote. As explained below, Plaintiffs focused their case entirely on proving the invalidity of the Meeting and did not establish that CJ lacked authority to commence the Tender Offer which gave it majority control of Cerego.

CJ is a separate legal entity from Cerego and is governed by Japanese law. Delaware law respects corporate separateness. "[O]ur corporation law is largely built on the idea that the separate legal existence of corporate entities should be respected . . . ." *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006). "Control through the ownership of shares does not fuse the corporations, even when the directors are common to each." *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2nd Cir. 1929). "Mere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity. Absent a showing of a fraud or that a subsidiary is in fact the mere alter ego of the parent, a common central management alone is not a proper basis for disregarding separate corporate existence." *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 681 (Del. Ch. 1978) (citations omitted). "[A wholly owned subsidiary] is an entity distinct from its stockholders even if its stock is wholly owned by one corporation." *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 231 A.2d 450, 454 (Del. Ch. 1967) (holding that a Delaware corporation's

wholly owned Mexican subsidiary was a separate entity), *aff'd*, 239 A.2d 629 (Del. 1968).

Under the internal affairs doctrine, issues relating to CJ's authority to act on its own behalf are to be determined under the laws of its jurisdiction of incorporation. *See McDermott Inc. v. Lewis*, 531 A.2d 206, 216–18 (Del. 1987) (holding that "application of [Delaware law] to [a foreign-incorporated entity] [in matters of internal affairs] would unfairly and, in our opinion, unconstitutionally, subject those intimately involved with the management of the corporation to the laws of Delaware").

Plaintiffs concede that if Cerego board action was not required for CJ to commence the Tender Offer, the "tender offer might stand up."[89]  Plaintiffs argue, however, that the burden was on the Intervenor to prove that Cerego board action was not required.[90]  I disagree.  The burden is not on CJ, a non-party, or on even Intervenor, to establish CJ's independent authority to commence the Tender Offer. Plaintiffs "have failed to present any valid reason why the evidentiary burden should be shifted to [Intervenor] . . . .  [Therefore,] the burden of proving that [Barbey]'s

---

[89] Dkt. 71 at 18:13.

[90] Dkt. 71 at 18:17–20 (Plaintiffs' Counsel:  "[I]nterestingly, there probably is a permutation in which Cerego Japan puts on evidence that, somehow, it is independent. And if so, its status as a wholly owned subsidiary matters not."); *id.* at 19:20–20:1 ("With the caveat, of course, that there's nothing in the record to demonstrate that Eric Young, whatever position he was in, authorized representative at the time of Cerego Japan, could unilaterally, on behalf of the company, decide to make a tender offer.").

removal was invalid rests with [Plaintiffs], the parties challenging its validity." *Unanue*, 2004 WL 2521292, at *10.

Plaintiffs focused their case on proving that Barbey did not receive the required notice of the Meeting and that all actions taken at the meeting are void.[91] Plaintiffs proceeded as though the inevitable result of that conclusion would be the invalidity of CJ's Tender Offer, which gave CJ majority ownership of Cerego and the ability to replace the Board.[92] The parties did not explore the application of Japanese law in this case, and the factual record on CJ's authority and decision-making process is thin. Plaintiffs did not seek discovery from CJ. The limited factual record shows that CJ was formed in 2000 and has existed continuously since that time. It has separate Articles of Incorporation,[93] and the record shows that CJ was an operating business as recently as 2015 and still owns related intellectual property.[94]

---

[91] *See* Dkt. 1 at ¶ 48 ("As a result, disguised from the Court and Barbey by Young's falsified E-mail Notice, Cerego Japan's tender offer was never authorized by the Board. Thus, the Inversion was not valid."); *see also* Dkt. 39 at 16 ("As a result, disguised from the Court and Mr. Barbey by Eric Young's falsified E-mail Notice, Cerego Japan's tender offer was never authorized by the Board. Thus, the Inversion was invalid."). Most of the three hours of trial were devoted to whether Eric Young sent Barbey a couple of emails.

[92] Dkt. 60 at ¶ 61 ("As a result [of the invalid Meeting], Eric Young was never authorized to issue a tender offer on the part of Cerego Japan—an act that, in [Eric] Young's view, required authorization from the Cerego Board. As a consequence, the purported Inversion that resulted from that tender offer was a void act.") (citation to the record omitted).

[93] *See* Dkt. 1 at Ex. G.

[94] JX 21 at I000036.

25

After post-trial argument, Plaintiffs filed a letter with the court attaching a document with two translated sections of the Japanese Companies Code.[95]  In calling the Court's attention to these provisions, Plaintiffs contend that under Japanese law, Cerego's vote, as the sole stockholder of CJ, was required to issue shares to commence the Tender Offer.[96]

"A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice."  Ct. Ch. R. 44.1.  "Delaware courts have frequently relied on experts to ascertain the substance of foreign law."  *Germaninvestments AG v. Allomet Corp.*, 225 A.3d 316, 335 (Del. 2020).  "At a minimum, the cases suggest that the movant's initial submission should be fulsome enough to address the foreign law in the context of the specific circumstances at issue."  *Id.* at 337.

By raising the issue of Japanese law after their final submission instead of with their first, and failing to otherwise give reasonable written notice, Plaintiffs have not timely raised the issue.  *See* Ct. Ch. R. 44.1; *see also Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived."); *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 n.12 (Del. 2004) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are

---

[95] Dkt. 70.

[96] *Id.*

deemed waived.") (internal citations and quotations omitted). Plaintiffs' post-argument submission also does not attempt to explain the legal result of a failure to obtain stockholder authorization under Japanese law. Therefore, it is not "fulsome enough to address the foreign law in the context of the specific circumstances at issue." *Germaninvestments*, 225 A.3d at 337.[97]

Therefore, the court finds, as a factual matter, that CJ is a separate entity and Plaintiffs have not met their burden to show that CJ lacked authority to commence the Tender Offer that resulted in its becoming Cerego's majority stockholder.[98]

---

[97] In their response to the Intervenor's proposed findings of fact and conclusions of law, Plaintiffs point to evidence that the Board believed the CJ tender offer required Cerego Board approval. Dkt. 63 at 4–5 (citing JX 10 (repeatedly noting that the Inversion's approval needed to occur "at a TBD future Full Board Meeting")). *See also* JX 21 at I0000336 ("[Cerego] has authorized [the Tender Offer]"). Although it is apparent that Eric Young and other members of the Board believed that Cerego's authorization was at least, in some way, relevant to CJ's Tender Offer, their subjective belief does not determine what the law is. In Delaware, "only the Delaware judiciary has the power, province and duty . . . to say what the law is . . . ." *Evans v. State*, 872 A.2d 539, 549 (Del. 2005) (internal quotation marks omitted); *see also Braga Inv. & Advisory, LLC v. Yenni*, 2023 WL 3736879, at *18 (Del. Ch. May 31, 2023) (holding that the legal effect of a contract provision was an issue of law for the court to decide "irrespective of whatever subjective belief [the parties] may have had about its meaning").

[98] Plaintiffs assert that "the shares being tendered were the property of Cerego, not Cerego Japan." Dkt. 63 at 6. This not only mischaracterizes the transaction, but also lacks any legal or factual support. "It is difficult to address th[is] theor[y] because [Plaintiff] only mentioned [it] briefly, did not develop the arguments, and did not provide any supporting [legal] authority . . . . A court need not address arguments that are presented in such a cursory and elliptical manner." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, *78 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

## III. CONCLUSION

Plaintiffs have proved that Barbey was not provided the required notice for the Special Meeting of the Cerego Board on September 17, 2021. Thus, all action taken at that meeting was void. But Plaintiffs have not met their burden of proof to show that CJ's Tender Offer was void. Therefore, Plaintiffs have not established that CJ, after becoming Cerego's majority stockholder, lacked the authority to remove Barbey, Intervenor, and Eric Young from the Cerego Board and to replace them with Ando.

Accordingly, judgment is entered in favor of Intervenor and against Plaintiffs.